Carpenters' Union et al., Appellants, v. Citizens' Committee to Enforce the Landis Award, a Corporation, et al., Appellees.

## Gen. No. 30,916.

1. MASTER AND SERVANT—*right of employees to organize to better their conditions by lawful means.* Employees may organize unions to bargain collectively with their employers on wages and working conditions and use all lawful means to obtain their wishes in that regard.

2. MASTER AND SERVANT—*right of employers to organize to obtain their wishes by lawful means.* Employers may organize to bargain with employees in a certain trade on wages and working conditions and use all lawful efforts to obtain their wishes in those respects.

3. MASTER AND SERVANT—*servant's right to enter or leave employment.* An individual employee may work or not work for anyone who wishes to employ him, and unless forbidden by contract may leave his employment at will.

4. MASTER AND SERVANT—*master's right to hire and discharge servants.* An employer may hire or not, as he wishes, one desiring to work for him and in absence of contract may discharge a given employee.

5. MASTER AND SERVANT—*servant's right to strike and master's to use lock-out.* Groups of employees or employers are not entitled to do all that individuals of either class may lawfully do, but so long as not acting for an unlawful purpose or in furtherance of a conspiracy the employees may strike and the employers use the lock-out.

6. TRADE UNIONS—*right to enforce "closed shop."* Union employees may in every lawful way try to establish and maintain a "closed shop" and to that end refuse working for any employer who will not agree thereto.

7. MASTER AND SERVANT—*employer's right to enforce "open shop."* Employers may use every lawful effort to establish and maintain an "open shop" and may refuse to employ anyone who will not work on that basis.

8. TRADE UNIONS—*when not obliged to conform to an arbitration award between employers and employees.* A carpenters' union which took no part in arbitration proceedings between employers and employees in the building trades of a city might conform to the award therein made but were under no legal obligation to so do.

9. INJUNCTIONS—*right to endeavor legally to enforce an arbitration award between employers and employees.* Anyone who believed that an arbitration award made to settle disputes between employers and em-

ployees in the building trades of a city was the best way out, had the right to use all lawful efforts to obtain general compliance with the award, and could not be enjoined therefrom.

10. INJUNCTIONS—*threats of breaking off business relations as illegal coercion.* Illegal coercion by a citizens' committee by threats of breaking off business relations with one who does not refuse to hire trade union members may be as effective as fear of violence to his person, and equally warrant injunction.

11. INJUNCTIONS—*attempted social ostracism of employers and employees not submitting to an arbitration award.* Attempts of a citizens' committee to enforce an arbitration award in a building dispute upon contractors and unions which had taken no part in the arbitration, by socially ostracizing them in case of their refusal to submit thereto and publicly classing all who differed with themselves as "outlaws and outcasts," are illegal coercion, warranting injunction.

12. INJUNCTIONS—*unwarranted attacks on character of trade unions.* Statements published by a citizens' committee that a labor union which refused to conform to the award in an arbitration in which it had no part was composed of gangsters, bombers, would-be murderers and was convict-led were without legal justification except so far as they would be actually proved against that particular union, and warranted injunction.

13. INJUNCTIONS—*right of citizens' committee to help maintain "open shop."* A citizens committee had the right in all legal ways to co-operate with an association of building contractor employers in maintaining their "open shops," without being enjoined.

14. INJUNCTIONS—*influence of defendants as affecting right of trade union to restrain their interference.* Under bill by a labor union to enjoin a citizens' committee from interfering with the union members obtaining employment, it is immaterial that certain of the defendants were such influential men as to induce certain employers not to hire the union members.

15. INJUNCTIONS—*employer's statements competent to show his fear of defendants, but not the cause thereof.* It is competent for a witness to testify for a labor union in its effort to enjoin a citizens' committee from interfering with its members getting employment that an employer said he did not hire union men because he was afraid his business would suffer, as showing his attitude of mind but not as showing there was a real basis for his fear.

16. INJUNCTIONS—*right to urge property owners to refuse building contracts to employers of union labor.* A citizens' committee may lawfully urge property owners to let their building contracts only to such employers as maintain an "open shop" without being restrained.

17. INJUNCTIONS—*right to urge architects to help maintain the "open shop."* A group of persons, not directly interested in the

building trades, have the right lawfully to urge architects to use their efforts to have buildings constructed under their direction to be built only by contractors who were maintaining an "open shop" as to certain labor unions of workers employed by them, without being enjoined therefrom.

18. INJUNCTIONS—*lawful means of contests between employers and employees.* In contests between labor and capital, the only means of injuring each other that are lawful are those that operate directly upon the control of work to be done and the supply of labor to do it and thus directly affect the apportionment of the common funds.

19. INJUNCTIONS—*coercing employers to maintain the "open shop" by threatening to withdraw building loans.* A group not directly interested in the building trades, which procured bankers to refuse building loans unless the buildings were to be erected by employers who maintained an "open shop" as to certain labor unions, were using means which had nothing to do directly with the contest between employers and employees and were guilty of illegal interference, justifying an injunction.

20. INJUNCTIONS—*statements of an employer competent to show his fear of building loan interference, but not as proving threat of interference.* Testimony that a building contractor had said he would not hire members of a certain union because his building loans might be interfered with was competent to show his state of mind, but not that defendants in a suit by the union to enjoin them from interfering with union members obtaining work had actually so interfered.

21. INJUNCTIONS—*abandonment of illegal policy before suit is brought.* Equity will not enjoin a policy of interfering with the rights of a trade union by procuring bankers to refuse loans to those who dealt with it, if that policy had been abandoned before suit was brought.

22. INJUNCTIONS—*right to aid employers maintain an "open shop" by procuring nonunion help.* Equity will not enjoin a group not directly interested in the building trades from obtaining workers from outside a city to help certain employers maintain an "open shop," at the instance of "closed shop" employers and labor unions affected.

23. INJUNCTIONS—*right to investigate "open shops" by a group inimical to labor unions.* Courts will not enjoin, at the instance of a labor union, a group not interested directly in certain business from investigating whether the "open shops" they were aiding were properly supplied with nonunion workers.

24. INJUNCTIONS—*employer's right to guard his property.* Employers who are endeavoring to maintain an "open shop" have the right to employ men to protect adequately their property, without being enjoined from so doing.

25. SHERIFFS AND CONSTABLES—*duty of sheriff to protect employer's legal rights.* If an employer who is trying to maintain an "open

shop'' is shown to be unable to protect his legal rights without official aid, the sheriff is in duty bound to enroll enough deputies to do so but he must keep them always under his orders in protecting such property and always keep them employees of the county.

26. MUNICIPAL CORPORATIONS—*duty of police chief to protect employer's legal rights.* Upon it appearing that employers are unable to protect their legal rights without aid, it is the duty of the chief of police of the city to protect them, if necessary, by enrolling extra men, but such extra force must remain under his direct orders and employment.

27. INJUNCTIONS—*giving a private group control over peace officers.* The law gives no authority to a sheriff or other peace officer to swear in deputies and turn them over to any private group in an official capacity, to be used and paid as that group desires in labor disputes, and such acts warrant an injunction.

28. EQUITY—*''clean hands'' confined to subject matter of litigation.* The equitable maxim of ''clean hands'' is confined to misconduct connected with the subject matter of the litigation of such a character as to affect the inter-relations of the parties and will not be extended to matter unconnected with the litigation and which does not affect the opposing party.

29. INJUNCTIONS—*what ''opposing party,'' in trade union's suit to restrain interference, includes.* The ''opposing party'' in a suit by a labor union, to enjoin a citizens' committee from interfering with its members' efforts to get employment, includes not only the committee but the employers whom they were aiding to maintain an open shop, in the sense that illegal acts done against the employers could be used by the defendants to defeat the union's right to an injunction, under the maxim of ''unclean hands.''

30. EQUITY—*maxim of ''unclean hands'' for court's protection.* The equitable maxim of ''unclean hands'' is not one intended for the benefit of the individual parties to the litigation but rather for the protection of the court itself.

31. INJUNCTIONS—*illegal acts prior to suit as part of a course of conduct.* In a suit by a labor union to enjoin a so-called citizens' committee from interfering with its members' obtaining employment, illegal acts of union members long prior to the suit may be considered if they are part of a course of conduct continuing up until the time of the suit, and the subject matter of the suit is to be considered as covering the whole period of the controversy between the parties.

32. INJUNCTIONS—*illegal acts of trade union officers affecting its right to.* In a suit by a labor union to enjoin interference with its members' obtaining employment, the members cannot avoid the effect upon their suit of the illegal acts of officers whom they have chosen to represent them.

33. INJUNCTIONS—*sympathetic strikes as illegal coercion of employers.* In a suit by a labor union to enjoin interference with its members' obtaining employment, evidence showing that it had promoted sympathetic strikes in other cities against employers who would not hire the union's members in its city, precludes granting an injunction even though the defendants were themselves guilty of conduct which otherwise could have been enjoined.

34. INJUNCTIONS—*illegal acts of trade union as ground for refusal to restrain interference with its rights.* Even though a so-called citizens' committee has illegally invaded the rights of a labor union by illegally defaming it, by procuring bankers to refuse loans to employers hiring union labor and by getting the sheriff to let them cover their guards with the official authority of deputies, still the illegal conduct of the union through its officers, in interfering with work being done by non-union laborers and in assaulting the latter and in calling sympathetic strikes in other cities against employers of their city who refused to employ their members, precludes a court of equity from granting to the union an injunction against the committee to prevent its interfering with the union members' obtaining employment, fair contracts and other rights.

TAYLOR, P. J., concurs in part and dissents in part.

Appeal by plaintiffs from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1926. Affirmed. Opinion filed June 13, 1927.

HOPE THOMPSON, for appellants.

SIMS, WELCH, GODMAN & STRANSKY and GEORGE W. MILLER, for appellees; ELWOOD G. GODMAN, GEORGE W. MILLER and JAMES S. HANDY, of counsel.

MR. JUSTICE THOMSON delivered the opinion of the court.

This is an appeal by complainants from a decree of the superior court of Cook county, dismissing their bill for injunction, for want of equity. The complainants, as named in the amended bill, are Harry Jensen, Charles H. Sand, president and secretary-treasurer, respectively, of the Chicago District Council of the United Brotherhood of Carpenters, Mark D. Taylor,

Thomas E. Ratcliff, and Fred C. Bromley, business agents of the district council, William J. Tornquist, William H. Schaefer and Alex Robertson, journeymen carpenters, who alleged that they filed their bill on behalf of themselves and of all other members of the local unions of the United Brotherhood of Carpenters in the Chicago district, numbering upwards of 20,000.

The defendants are the Citizens' Committee to Enforce the Landis Award, a corporation not for profit, and the individual members of the committee, numbering about 180.

The following facts are involved in the controversy presented in this case. Employers of carpenters in Chicago maintained an organization called the Carpenter Contractors' Association. An agreement covering wages and working rules was entered into between that Association and the Carpenters' Union on June 1, 1918, for a period of three years. When that contract expired, the Carpenter Contractors' Association had been absorbed with other organizations of employers, into another association called the Associated Builders. The latter succeeded the Carpenter Contractors' Association as a party to the agreement with the Carpenters' Union, entered into in 1918. There was a board known as the Arbitration Board, containing five members representing the association, and five representing the union, whose duty it was to negotiate a new agreement to succeed the agreement of 1918, when it expired in the spring of 1921. Complainants Jensen and Ratcliff were two of the members of that board, representing the union. In the course of negotiations for such new agreement, the members of the Arbitration Board reached a deadlock on three questions. The contractors insisted that: (1) There should be no restriction upon the use or installation of nonunion made material; (2) that all jurisdictional disputes should be referred to the National Board of Jurisdictional Awards for binding decision; and (3)

that wages should be fixed at $1.00 per hour. The carpenters contested all three of these points, holding out for a wage of $1.25 per hour. Although the Carpenters' Union and the Associated Builders could not agree upon the terms of a new contract, the union did negotiate new contracts on their terms with a large number of independent contractors, not affiliated with the Associated Builders.

Most of the trade agreements with the various branches in the building industry expired in May, 1921. The difficulties involved in the situation generally were such that practically all building ceased in Chicago on May 1. Among those who ceased work at that time were the carpenters. About the middle of June the Building Construction Employers' Association, covering about 23 building trades and including about 16 trade organizations, and the Building Trades Council, an organization with which all of the building trades unions were affiliated, agreed to submit the controversy existing between the employers and the unions to Judge Kenesaw M. Landis, then presiding in the United States District Court at Chicago, as arbitrator, to determine upon a proper scale of wages to be paid to building craftsmen and to recommend fair and equitable conditions of employment. This arbitration agreement recited that the parties thereto were acting for themselves and "all their respective affiliated associations and unions." The Associated Builders, being affiliated with the Building Construction Employers' Association, became a party to those arbitration proceedings. Although the Carpenters' Union was affiliated with the Building Trades Council, it refused to become a party to the arbitration.

The arbitrator consented to act, upon condition that, pending his decision, all craftsmen in the building trades should return to work and all employers should permit them to resume, at the wages which had been

in effect when building activities ceased on May 1. This was agreed to and practically all the men returned to work, including the carpenters. The latter than received $1.25 an hour as that had been the wage they were receiving at the conclusion of the period covered by the 1918 agreement. No agreement was made as to how long this wage was to be paid. It seems to have been generally understood that it was to be until Judge Landis made his decision, and apparently the contractors felt that although the carpenters had not come into the arbitration, they would, nevertheless, be willing to be guided by the wage scale which he fixed for the other unions.

Judge Landis handed down his decision early in September, 1921. It has since been known as the Landis Award. In the course of his decision Judge Landis referred to a tentative carpenters' agreement, which had been submitted early in the proceedings, and pointed out that in several particulars it was at variance with the terms of a form of new uniform agreement which was incorporated as a part of his decision. He then said: "Should this agreement be rewritten according to the uniform agreement, uniform suggestions and principals, the wage would be fixed on the same scale as others, at $1.00 per hour." Judge Landis then referred to the carpenters and certain other trades that had refused to come into the arbitration, and said that in applying a wage scale to the new conditions of the trades that had come into the arbitration, he had fixed such a scale, "with the distinct understanding that those trades that have refused to come in and revise their agreements along just and reasonable lines,  *  *  *  will not receive your" (referring to the trades that had come in) "support of their wasteful and subversive practices, for this would be to permit them to capitalize your good work to their advantage and to your detriment. The highest dictates

of both morality and interest require that you adopt and adhere to this policy.''

The employers, having been parties to the arbitration, considered themselves obligated to carry out the principles and recommendations contained in the award of the arbitration. Employers of carpenters took this position as to that trade, although the Carpenters' Union had not come into the arbitration, their position being that if they made working agreements with the Carpenters' Union, contrary to the terms and principles laid down in the award for all the other trades, and there recommend for that of the Carpenters, as one of them expressed it, in the course of his testimony, he would ''then have on my hands the other union trades working under other conditions and under other wage scales, which they might not agree to, and would simply be in a continual argument as between all the trades.''

Sometime after the Landis Award was announced, the Arbitration Board, representing the Associated Builders and the Carpenters' Union, held a meeting. The representatives of the employers submitted an agreement in the form recommended by the arbitrator, with the suggestion that the wage scale for the period of the proposed agreement be fixed at $1 an hour. At an adjourned meeting the carpenters' representatives submitted an agreement substantially in the form of the old one which had expired the previous May, and fixing the wage scale at $1.25 an hour. Neither side being willing to yield, no agreement was reached. As the negotiations ended, Jensen, president of the district council, one of the members of the Arbitration Board and one of the complainants in this case, announced to the members of the Arbitration Board representing the Associated Builders that some day they would be obliged to come to an agreement with the Carpenters' Union and that when they did they would

be obliged to write their name at the bottom of the page, and that Carpenters' Union would then write their agreement above it.

When the employers and the carpenters failed to come to an agreement, the Building Construction Employers' Association and the Associated Builders organized a joint committee to work out plans for the employment of skilled carpenters as well as those in other trades, who had either kept out of or refused to abide by the Landis Award, of which there were about ten, and endeavor to resume building construction under the terms and conditions laid down in the award. Thus there began a contest between the contractors on the one hand and the carpenters and some other trades on the other, wherein the contractors sought to resume and continue operations and the carpenters, and other trades referred to, sought to prevent such successful operation. Among other things, the contractors provided insurance against damage to work on which they were engaged; employed guards to protect the work from damage, and established an employment bureau through which carpenters and men in other trades were brought in from outside territory and given employment, on work which was going ahead under the terms of the Landis Award.

After the contractors had contributed and expended something over $100,000 in their efforts, it became apparent that they would have to seek assistance from others, or else either yield to the carpenters' demands and abandon the Landis Award, or stop building operations altogether. They concluded to see if they could procure some assistance, and with that end in view a meeting was held in October, 1921, at the La Salle Hotel in Chicago, to which various organizations were invited to send representatives. These organizations included the Chicago Association of Commerce, the Illinois Manufacturers' Association, the Western Society of Engineers, the local chapter of the American

Institute of Architects, the Illinois Society of Architects, the Chicago Real Estate Board, the Cook County Real Estate Board, the banks of the city and other business groups. At this meeting, the situation from the contractors' standpoint was explained. Those present were told that the contractors desired to carry out the terms and principles contained in the Landis Award, and, if possible, secure their adoption and observance in the building industry of Chicago, because they believed such a course to be for the best interests not only of that industry but of the public generally. A committee was appointed to investigate the situation and determine the possibilities and at a later meeting it was decided to organize a citizens' committee, to co-operate with the contractors in their efforts to carry out the terms of the Landis Award in the building industry in Chicago. To make sure that the effort would be something more than a temporary affair, the contractors requested, and they were given definite assurance, that the Citizens' Committee would become a permanent organization and, on the other hand, to insure sustained co-operation on the part of the contractors, the employers' association exacted pledges from individual contractors that they would uphold and support the terms and principles of the Landis Award. Thus the individual defendants came to be organized into the defendant corporation, not for pecuniary profit, known as the Citizens' Committee to Enforce the Landis Award. The object for which it was formed, as stated in its charter, was to enforce the award made by Judge Landis, as to the wages to be paid in the building industry in Chicago, and the agreements and principles upon which the award was made, ''and to establish and maintain equitable and fair conditions in the building industry in Chicago and vicinity.'' After the committee had been established, it issued a number of pamphlets which were distributed

Carpenters' Union v. Citizens' Committee, 244 Ill. App. 540.

among those engaged in the building industry, and among them was one in which it stated its purposes and objects in the following language:

"To bring about the far-reaching benefits of the uniform observance of these principles, the Citizens' Committee to Enforce the Landis Award was created.

"The Citizens' Committee proposes that hereafter these conditions obtain, and announced at its initial meeting the following policy:

"1. Those employers who continue their operations under the terms and conditions of the Landis Award will be encouraged and, when necessary, protected in their operations.

"2. Those unions which accept the terms and conditions of the Landis Award, both in spirit and fact, will be supported.

"3. The sale and use of material going into building operations shall be free from arbitrary restrictions.

"4. Contractors who refuse to operate under the Landis Award deserve neither the encouragement nor the support of the public.

"5. In those trades where the unions do not accept the terms and conditions of the Landis Award, work shall continue by workmen who are willing to work, regardless of their union affiliations. These men will be protected and these trades will be permanently established on the basis of the open shop."

The committee included in its membership representatives of the different mercantile, banking, and other business interests in Chicago. They had large influence in the life of the city, financial and otherwise. At the time of the hearing of this case in the trial court, they had collected and expended, in their work of supporting the contractors in their endeavor to maintain the Landis Award in the building industry of the city, a total of more than $3,000,000.

When the Citizens' Committee got to work, the Associated Builders and the Building Construction Employers' Association, in co-operation with which the Citizens' Committee has always acted, organized a committee known as the "Contact Committee." On the other hand, the Citizens' Committee appointed an executive committee. Policies to be pursued by the co-operating interests were discussed and determined by the Executive Committee of the Citizens' Committee and the Contact Committee representing the contractors, and were then sent out to the individual contractors by means of bulletins.

The complainants filed their bill in October, 1922, after the defendants had been acting in their afforts to uphold the terms of the Landis Award for about a year. By their bill the complainants sought to enjoin the defendants:

(1) From maintaining a combination for the purpose of exerting influence upon bankers, architects or employers in the building industry in Chicago and vicinity, which in any way interferes with, obstructs or hinders freedom of contract between such employers and complainants.

(2) From combining and conspiring, in any manner, to interfere with, injure or disturb the employment of complainants, or to restrain freedom of contract between them and the employers.

(3) From coercing, soliciting, advising, or inducing any person to refuse to employ complainants or any of them or to refuse to negotiate with complainants' authorized representatives.

(4) From enforcing or attempting to enforce any agreement designed to restrain freedom of contract between complainants and the employers.

(5) From attempting to interfere with the employment of complainants, by newspaper advertisements and other means specifically complained of.

(6) From designating or referring to the Carpenters' Union as an ''outlaw,'' or its officials as ''criminals'' or ''grafters.''

(7) From attempting to establish or maintain an ''open shop'' in the carpenters' trade, in Chicago, or in any way to interfere with, hinder, disturb, disrupt or injure the Carpenters' Union.

(8) From advertising for, soliciting or inducing nonunion carpenters to come to Chicago in furtherance of their alleged conspiracy.

(9) From assaulting, threatening, or intimidating any of complainants.

(10) From sending men to buildings under construction, representing themselves as deputy sheriffs.

(11) From boycotting or inducing, aiding, advising or influencing any person to boycott complainants, either individually or as an organization.

(12) And from doing any other thing to injure or interfere with the complainants or their employers in furtherance of the conspiracy in which the defendants were alleged to be engaged.

By their answer, the defendants admitted certain allegations of the bill of complaint and denied others. In general, the defendants alleged that they were engaged in only such acts as were lawful; that they were merely endeavoring to co-operate with contractors and those desiring the assistance of the Citizens' Committee, in a lawful and proper way, to combat the unlawful attempts of the complainants in combination, to force upon contractors and employers terms and conditions of employment with which such employers were not in sympathy or accord and which they believed to be intolerable and inimical to the best interests of the building industry and the public generally, which terms and conditions of employment defendants alleged, were wholly arbitrary and intended to establish in the complainants a powerful labor oligarchy, to the domination and control of which contractors and employers in

the building industry would be compelled to submit in the conduct of their affairs and thereby be deprived of their legal right to conduct their own affairs and business. By their answer the defendants further alleged that the complainants were not entitled to the relief sought by them in their bill of complaint as they had not come into equity with clean hands and they alleged the facts which they contended established such to be the case. Many of the allegations of fact found in the pleadings will be referred to later. After an extended hearing, the chancellor dismissed the complainants' bill for want of equity. To reverse that decree, they have perfected this appeal.

It will not be necessary to cite authority for certain propositions that have come to be firmly established through many decisions of the courts both of our own State and other jurisdictions. Those who are engaged in the business of selling their labor and skill for wages have the right to organize for their common protection and advantage. Through such organizations or unions they have the right to bargain collectively with their employers, in connection with all matters affecting their employment, including the questions of wages or of working conditions and rules. As a group they may put forth any lawful effort to accomplish the things they deem to be for their good. Likewise the employers have the right to organize for their common protection and advantage, and to bargain as a group with employees in a given trade, in the matter of wages or of trade rules and working conditions. As a group the employers may also put forth any lawful effort to accomplish the things they deem to be for their good. Thus the Carpenters' Union, the Associated Builders and the Employers' Association all had a right to exist and to function, so long as they did not trespass upon the legal rights of others.

Any individual employee has the right to work for anybody who wishes to employ him, or, if he so elects,

he may decline to work for any such person. Disregarding matters of contract, he may cease working for his employer, if he deems that to be for his best interests. Similarly, an employer may or may not hire a given employee, as he pleases, and, again disregarding contract questions, he may discontinue his employment of a given employee, whenever he deems that to be to his advantage.

It does not always follow that what an individual employee or an individual employer may lawfully do, groups of employees as labor unions or of employers as trade associations may also do. "The mere force of numbers may create a difference, not only a degree, but also of kind." *Auburn Draying Co. v. Wardell,* 227 N. Y. 1; *Carlson v. Carpenter Contractors' Ass'n,* 224 Ill. App. 430; *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n of North America,—*U. S.—, 71 L. Ed. —, 47 Sup. Ct. 97. But so long as they are not acting for an unlawful purpose or in furtherance of an illegal conspiracy, union employees may strike whenever they deem such action to be for their advantage, and likewise employers of labor may employ the lockout if they consider that to be for their best interests.

Union employees may make every lawful effort to establish and maintain a "closed shop" and to that end may decline to work for any employer who refuses to agree to that policy. A contrary rule has been announced in a few jurisdictions, but, in our opinion, the majority and the sounder rule is as we have stated it. *Adair v. United States,* 208 U. S. 161; *Coppage v. Kansas,* 236 U. S. 1. On the other hand employers may make every lawful effort to establish and maintain an "open shop" and to that end have the right to refuse to employ anybody unless they agree to work on that basis. The fact that either of these policies may tend to weaken the other, in no way affects the mutual rights of employees or employers to maintain

that policy or status which they prefer, by any lawful means. Both employees and employers, as individuals and as groups, have similar and equal rights of freedom to contract as they choose, and of protection from unlawful interference with such rights, by the other.

In *Iron Molders' Union No. 125 of Milwaukee, Wis. v. Allis-Chalmers Co.*, 166 Fed. 45, in discussing the rights of employers to lock out their employees and the rights of the latter to strike, Judge Baker said:

"These rights (or ligitimate means of contest) are mutual and are fairly balanced against each other. Again, an employer of moulders, having locked out his men, in order to effectuate the purpose of his lockout, may *persuade* (but not coerce) other foundrymen not to employ moulders for higher wages or on better terms then those for which he made his stand, and not to take in his late employees at all, so that they may be forced back to his foundry at his own terms; and moulders, having struck, in order to make their strike effective may *persuade* (but not coerce) other moulders not to work for less wages or under worse conditions than those for which they struck, and not to work for their late employer at all, so that he may be forced to take them back into his foundry at their own terms. Here, also, the rights are mutual and fairly balanced. On the other hand, an employer, having locked out his men, will not be permitted, though it would reduce their fighting strength, to coerce their landlords and grocers into cutting off shelter and food; and employees, having struck, will not be permitted, though it may subdue their late employer, to coerce dealers and users into starving his business. The restraints, likewise, apply to both combatants and are fairly balanced. These illustrations, we believe, mark out the line that must be observed by both. In contests between capital and labor the only means of injuring each other that are lawful are those that operate di-

rectly and immediately upon the control and supply of work to be done and of labor to do it, and thus directly affect the apportionment of the common fund, for only at this point exists the competition, the evils of which organized society will endure rather than suppress the freedom and initiative of the individual. But attempts to injure each other by coercing members of society who are not directly concerned in the pending controversy to make raids in the rear cannot be tolerated by organized society, for the direct, the primary, attack is upon society itself. And for the enforcement of these mutual rights and restraints organized society offers to both parties, equally, all the instrumentalities of law and of equity.''

In the case just referred to, Judge Baker well said that ''in the fullest recognition of the equality and mutuality of their rights and their restrictions, lies the peace of capital and labor.'' Litigation, which marks an absence of that peace, would be very much less if both sides of these controversies would recognize the truth of that statement and endeavor to follow it in the conduct of their affairs. In emphasizing the rights of employees, counsel for complainants have referred to the recent case of *Anderson & Lind Mfg. Co. v. Carpenters' District Council,* 308 Ill. 488, and quoted the language of our Supreme Court to be found in that decision, to the effect that: ''Every man has a right, under the law, to full freedom in the disposal of his labor according to his own will, and the right of workmen to organize for the purpose of promoting their common welfare by lawful means is fully recognized and always maintained by the courts. Workmen have a legal right, when not bound by contract, to quit employment either singly or in a body, with or without cause. Workmen may impose any conditions of their employment which may be deemed beneficial by them and if denied may quit the service, * * *.'' Counsel ended the quotation at that point with a period. The

balance of the sentence, in the middle of which the quotation stopped, gives the corollary to the proposition contained in the part quoted, and one is just as essential to a full statement of the law affecting the rights of capital and labor as the other. The remainder of the sentence reads: "* * * but it does not follow from the existence of these rights that no one else has a legal right, which may be disregarded and invaded without committing a legal wrong or incurring responsibility." The court then proceeded to hold that the employer there involved had "an absolute legal right" to conduct its business on an open shop basis "free from molestation, for the purpose of injuring it or coercing it to comply with the demand that it should operate a closed shop."

In deciding the issues presented in the case at bar, we are of course not concerned with the relative merits of the open and closed shop principles, nor with the question of whether $1 or $1.25 was a reasonable and proper wage for carpenters in 1921, nor are we concerned with the alleged merits of the Landis Award. The Carpenters' Union chose not to come into the arbitration proceedings which resulted in that award. The carpenters were, therefore, under no legal obligation to accept the award so far as its terms may be said to have referred to them. They might have conformed to the terms of the award had they chosen to. They were within their legal rights in electing not to. On the other hand the employers, *or anyone else,* had the right to believe that the terms of the Landis Award were just and fair and that a way out, from the conditions which that arbitration sought to remedy, would be accomplished if all those engaged in the building industry complied with them, and if they did so believe, they had the right to do all that they legally might, to bring about such general compliance. In our opinion it was entirely within the lawful means available to the Associated Builders and the Employers' Association

to enlist the assistance and co-operation of the Association of Commerce and all the other organizations which participated in the formation of the Citizens' Committee, and it was entirely within the legal rights of the latter to endeavor to accomplish general compliance with the Landis Award, both by contractors and by employees engaged in the building trades, so long as the things they did to accomplish that end did not trespass upon the legal rights of the contractors or the employees or anybody else directly concerned. *Thomas v. Cincinnati, N. O. & T. P. Ry. Co.,* 62 Fed. 803; *Cornellier v. Haverhill Shoe Manufacturers' Ass'n,* 221 Mass. 554; *State v. Employers of Labor,* 102 Neb. 768. The real question here presented is, Were the things which the defendants did, or were any of those things, such as violated the legal rights of the complainants? We are of the opinion that some of them were not, but that there are others, which were. The further question is presented: Were the things which complainants themselves did, in the course of this controversy, such as violated the legal rights of the employers? Again, we are of the opinion that some of them were not, but that there are others which were.

First we shall consider some of the things the defendants are alleged to have done, which it is contended violated the legal rights of complainants. There would have been no invasion of such rights, if the defendants had merely attempted to persuade all owners, contractors and architects to operate under the award —if they had "just gone into a selling campaign to persuade the people to buy the Landis Award," as one witness put it—but the evidence shows that they went beyond that and, in various ways, attempted to accomplish that result by coercion. It is axiomatic that "coercion is as easily accomplished without threats of violence as with them, and fear of loss or injury to business unless one submits to demands is a effective as fear of violence to his person. No person has a right

to make war on another and to compel others to break off business relations with him to his injury." *Anderson & Lind Mfg. Co. v. Carpenters' Dist. Council,* 308 Ill. 488; *O'Brien v. People,* 216 Ill. 354; *Wilson v. Hey,* 232 Ill. 389; *Barnes & Co. v. Chicago Typographical Union,* 232 Ill. 424.

In November, 1921, the defendant Donnelley addressed a meeting of the Association of Commerce, at the La Salle Hotel in Chicago, on the subject of the controversy between the contractors and the unions which were not working under the Landis Award. The largest one in this class was the Carpenters' Union. Some of the unions which had come into the arbitration had refused to abide by the terms of the Award, although they had pledged themselves to do so. The Carpenters' Union, however, as heretofore pointed out, had never come into the arbitration proceedings. Nevertheless, the latter was classed with the former. Donnelley referred to all of them as "recalcitrant unions." He closed that speech by asking those present, "when you hear of anybody that is carrying on building that is not according to the Landis Award, to tell that man what you think of him, and don't be afraid to tell him straight. * * * anybody from now on who starts a building in Chicago and who does not insist that the contracts shall be made so that the contractor must work 100 per cent under the Landis Award is betraying his city, and we have got to depend upon you to make that man feel ostracised the same as were those who, during the war, did not come through 100 per cent American." In a pamphlet circulated by the defendants in the spring of 1922, among architects and contractors, it was stated in substance that the state of the public temper then prevailing made it clear "that a contractor who refuses to go along now, is declaring himself 'out' as a good citizen." In the same pamphlet it was stated that when the "War for Decency," then being waged, had been won, those who

had refused their co-operation "will be justly regarded as having given 'aid and comfort to the enemy,' which is the language used in the Constitution of the United States to define treason." In another pamphlet issued later, the Carpenters' Union and those who had broken their agreement to abide by the terms of the decision of the arbitrator were referred to as "these ten outlaws."

In a pamphlet issued by the Associated Builders and circulated by the defendants, in November, 1921, the statement was made that there would be "rough seas ahead" for all "contractors, labor organizations and others who do not assist in making the Landis Award one hundred per cent plan of operation." This pamphlet asked if those to whom it had been sent had been "called on the carpet" as yet, by the Citizens' Committee. It was then suggested that if they had not, it would be best to so conduct themselves that they would not be, "for it has been reported that some contractors, who had already appeared before the Committee, spent an uncomfortable half hour." This pamphlet stated that contractors doing 85 percent of the building work of Chicago at that time were pledged to sustain the Landis Award and that 44 out of 51 trades were abiding by its terms. It was then stated that "the other 15 per cent of both employers and labor unions may be classed as outlaws and outcasts and the citizens of Chicago have formed a permanent organization to handle them without gloves."

We repeat, we may not here concern ourselves with the merits of the Landis Award. Those who, like the defendants, honestly believed that all who had the best interests of the building industry and the entire community at heart should uphold the award "100 per cent," as they expressed it, could not lawfully, publicly class as "outlaws and outcasts" all those who differed with them. The Carpenters' Union and all owners, contractors and architects had a right under the law to

entire freedom to contract with each other, and to conduct their affairs, as they chose and without regard to the Landis Award, without fear of loss or injury to their business, unless they supported the award, and without being subjected to such threats of public ostracism as are to be found in the utterances to which we have referred. The acts of defendants in this regard were an attempt to coerce and not persuade.

Other expressions of a different type are to be found in some letters sent out by the defendants in their efforts to secure funds to carry on their program and in advertisements published frequently by them in the daily press. In one such letter it was stated that the defendants were endeavoring to save Chicago's building industry "from the grasp of the slimy, deadly tentacles of these devilfish who are after the financial life blood of every little home and every big building." It was stated that if the "war," then on, was not won, life in Chicago would be "utterly in the hands of blackmailers, sluggers, professional gunmen, convicts and criminals to take when and where they please." The advertisements put in the papers by the defendants, which are complained of, referred to labor unions as a "crime syndicate"; stated that the building industry "was rotten to the core with graft, waste and conspiracy"; asked the citizens if they wished to see "the gangsters and terrorists rule our city with the bomb, the blackjack and the gun"; stated that Landis Award jobs must be guarded "that bombers, sluggers and would-be murderers may be held at bay"; offered a reward for the arrest and conviction "of the four labor gangmen" who had murdered some policemen; stated that "the convict-led labor unions, which have been fighting the Landis Award have now descended from slugging and bombing, to wanton and cold-blooded murder * * *. But the work of the Citizens' Committee will go on until it has rid Chicago entirely of this menace. * * *. Stand by the Citizens' Commit-

tee, the Chief of Police, the State's Attorney, and the law enforcing officers if the law abiding citizens of Chicago.''

The record shows that the campaign waged by the defendants was directed principally against the carpenters, as a group, and their union. The record further shows that the latter did indulge in some violence, to which we shall have occasion to refer later, and that a former official of the Carpenters' Union had been convicted of conspiracy. While reference to such matters might properly have been indulged in by the defendants in their letters, pamphlets or advertisements, we are of the opinion that much that these documents contained finds no justification in any of the facts disclosed by this record. That crimes of the sort referred to in these documents have been committed in Chicago, by individuals connected with groups of employees involved in labor disputes, is a matter of public record. But, in our opinion, there was no justification for heaping these accumulated offenses on the heads of the Carpenters' Union or of those who happened to be opposing the Landis Award. Except as to such statements as could be warranted by any offenses of this nature, which were shown to have been committed by those involved in the controversy in hand, the statements referred to were, in our opinion, without any legal justification. No such showing is made except as to one or two of the statements complained of.

It is clear from the evidence in the record that the defendants had no quarrel with union labor as such. They did not oppose labor unions as a class. They gave their unqualified support to all unions which came into the arbitration proceedings and conformed to the terms of the award when it was made. Before the Citizens' Committee was organized, the Associated Builders adopted the policy of refusing to have any negotiations with those unions which had violated their

agreement to abide by the result of the arbitration proceedings conducted before Judge Landis. The Associated Builders adopted the same policy as to the Carpenters' Union. They gave as their reason for this that the Carpenters' Union had struck for higher wages on two different occasions during the period of the 1918 agreement between the carpenters and the Carpenter Contractors' Association, contrary to the express terms of that agreement, and the further fact that it had proved impossible to negotiate a new agreement in 1921 with the union representatives on the Arbitration Board, and that when those negotiations for a new agreement finally broke up, the union representatives had made the statement that the employers would be forced to come to their terms, and that when they made their next contract, the employers would, in substances, sign on the dotted line, after which the union would write their contract above it. After the Citizens' Committee was organized and the policies to be pursued by the employers, with that Committee's help, came to be determined by the Executive Committee of the Citizens' Committee and the Contact Committee of the Associated Builders and the Employers' Association, the policy which had been adopted before the Citizens' Committee was organized was continued and the employers with whom the Citizens' Committee was co-operating refused to have any dealings with the Carpenters' Union.

Those employers, as well as the Citizens' Committee, adopted an open shop policy with regard to carpenters. They had the legal right to conduct their business on that basis, if they chose to do so. *Anderson & Lind Mfg. Co. v. Carpenters' Dist. Council,* 308 Ill. 488. If the defendants had the right to co-operate with the Associated Builders at all, and we hold they did have, then their rights extended to this or any other legitimate and legal plan agreed upon. The maintenance of the open shop policy by the employers, af-

filiated with Associated Builders, naturally precluded their making agreements with the Carpenters' Union, which would involve an agreement to maintain a closed shop.

No objection was made by either the defendants, or the Associated Builders, or the contractors affiliated with them, to the. employment of union carpenters, provided they agreed to work under the Landis Award, for wages of $1 an hour and under open shop conditions. They were within their legal rights in offering those terms to all carpenters alike, union or nonunion. They had the right to refuse to employ a union carpenter unless he agreed to work under open shop conditions, just as the union carpenter had the right to refuse to work for an employer unless he agreed to run a closed shop. And the Associated Builders and the Citizens' Committee had the same right to endeavor to establish the open shop generally among the employers employing carpenters, as the Carpenters' Union had to endeaver to establish the closed shop generally, among those employers for whom they worked. Each group had the same rights in that regard and was limited by the same restrictions. While the defendants and their associating contractors might try to persuade all contractors employing carpenters to adopt the open shop policy, they could not do anything in an attempt to coerce any who chose not to do so, or interfere with them in employing union carpenters on the union terms or negotiating a working agreement with the Carpenters' Union if they chose to do so. In our opinion, a case of improper coercion is not made out by the mere fact that some of the defendants were men of influence and that some contractors, because of that fact, concluded to support the Landis Award and co-operate with the Associated Builders and the Citizens' Committee. The chief witness by which complainants sought to establish that situation, however, was shown to have been moved by the influ-

ence of the Associated Builders rather than any of the defendants, for the evidence shows that he made an agreement to support the Landis Award and conduct his business accordingly, before the membership of the defendant Committee was announced, or the Committee was created. In our opinion, the fact that the defendants were men of great influence among contractors, and that this was an element which at one time moved Strandberg, a contractor, to pledge his support to the Landis Award, as he testified (and probably had a similar effect on other contractors), was immaterial, just as was the similar fact that the complainants, and others associated with them, were men of great influence among carpenters, and that this was an element which moved the union carpenter foreman, Holep, to refuse to continue to work for the contractor Snyder, as the latter testified, unless he conformed to union requirements (and that this likewise, probably had a similar effect on other union men).

It is claimed that the defendants attempted to coerce independent contractors to refuse to deal with union carpenters on their own terms or with their union, but to support the Landis Award and conduct their business on the open shop basis, by threatening to divert business from them unless they did so. Such conduct, in our opinion, would amount to an illegal interference with the freedom of the independent contractors to conduct their business as they saw fit. Some of the evidence which was offered by complainants on this point, and admitted over objection, was incompetent for the purpose of establishing the facts contended for. In the instances to which we refer, the contractors who, it is claimed, were improperly coerced by the defendants, were not called as witnesses, but the complainant Ratcliff, a business agent of the Carpenters' Union, was called to testify as to conversations he had with such contractors. It was permissible for Ratcliff to testify that a given contractor had told him that he

would not negotiate with the union or hire union carpenters, on the union terms, because he was afraid his business would suffer, under the existing circumstances if he did so. Such testimony was admissible under an exception to the hearsay rule, to show the contractor's state of mind, and his reason for declining to deal with the Union. But such testimony was not competent on the question of whether there was in fact a real basis for the contractor's fear, nor was it proper for Ratcliff to testify (the testimony being submitted on the issue last referred to) as he was permitted to, over objection, that certain named contractors had told him that some representative of the Citizen's Committee had told them that, unless they hired carpenters working under the Landis Award, they would get no more contracts "through the Citizens' Committee or through their architects," and that, for that reason, they were unwilling to hire union carpenters although they, in fact, would like to do so. Those with whom Ratcliff claimed to have had these conversations, who were called as witnesses in rebuttal by the defendants, denied that they had made the statements attributed to them.

In our opinion, the evidence fails to establish the charge that the defendants attempted to coerce independent contractors to support the Landis Award, by exercising any improper influence to keep business away from them. The Citizens' Committee, in concert with the Associated Builders and the Employers' Association, did urge owners who were about to build to let their contracts to Landis Award contractors. An owner might let his contract to one working under the Landis Award or not, as he chose. The defendants were not trespassing upon any legal rights of the contractors who were not working under the Landis Award, nor of the Carpenters' Union, nor of complainants, in urging such owners to let their contracts to some contractor who was working under the Landis Award.

We are likewise of the opinion that the evidence fails to establish the charge that the defendants attempted to coerce the architects to support the Landis Award, by exerting any improper influence, either to keep business away from them unless they did so or to compel them to refuse to engage a contractor unless the latter was working under the Landis Award. The architects, or any of them, had the same right that anyone else had, whether owner, contractor or citizen, to support the Landis Award or not as they chose, independent of any improper interference from others. The defendants, in co-operation with the Associated Builders and the Building Construction Employers' Association, had the legal right to seek the support of the architects and to urge what they considered the merits of their cause, upon them. The evidence in the record shows that in all they did the course of the architects was without any improper influence or interference from these defendants or the organized contractors. The first meeting at the La Salle Hotel, to which reference has heretofore been made, was held "early in October, 1921." The evidence shows that very shortly thereafter, and before the defendant committee came into existence, the Illinois Chapter of the American Institute of Architects held a meeting, at which they adopted a resolution to the effect that inasmuch as agreements had been made by most of the building trades to abide by the Landis Award, for the stated purpose of preventing annoyance and avoidable expense, and for the advancement of labor and productivity in the building trades, and since the faithful carrying out of these agreements would, in the judgment of these architects, tend to bring about those results, therefore, by their resolution, they requested all their members and all other architects to co-operate, and to incorporate a clause in such building contracts as they might draw up, which would specify that all work done under them was to be done under the terms

of the Landis Award. The day after this resolution was adopted, the secretary of the chapter sent a copy of it to O'Leary, who had acted as chairman of the LaSalle Hotel meeting. Later, when the Citizens' Committee was organized, the chapter, at its November or December meeting, adopted further resolutions "pledging their support to that Committee." The chapter appointed a committee to represent it in that co-operation. That committee endeavored to secure the support of as many architects as possible in this effort. The Citizens' Committee sent a letter to all architects, as well as contractors and owners, urging them to support the Landis Award. It contained nothing, in our opinion, beyond legitimate persuasion, which they had a legal right to use and which did not invade the legal rights of these complainants or anybody else.

We repeat what the court said in the *Iron Molders' Union No. 125 of Milwaukee, Wis. v. Allis-Chalmers Co.,* case, *supra,* to the effect that, "In contests between capital and labor the only means of injuring each other that are lawful are those that operate directly and immediately upon the control and supply of work to be done and of labor to do it, and thus directly affect the apportionment of the common fund, for only at this point exists the competition, the evils of which organized society will endure rather than suppress the freedom and initiative of the individual." In our opinion, the efforts of the Citizens' Committee put forth, in co-operation with the Associated Builders and the Employers' Association to which we have referred, to persuade the owners, contractors, and architects, to support the Landis Award and, to that end, have all contracts provide that the work done under them was to be performed according to the terms of that award, were without any element of coercion, and they operated directly and immediately upon the subject matter of the controversy between the employing contrac-

tors and the carpenters, namely, the control and supply of the carpenter work to be done and of carpenter labor to do it, and that those efforts were, therefore, legal.

But it is urged that this may not be said of similar efforts put forth by the Citizens' Committee and the contractors, whereby they sought to have the mortgage bankers of the city cut off the supply of money sought in the way of loans, unless those who applied for such loans agreed that the work in connection with which the borrowed money was to be used would be done under the Landis Award. On this question the evidence in the record shows that among those in attendance at the La Salle Hotel meeting, in October, 1921, by invitation of those who arranged the meeting, were certain representatives of the bankers, whose business included the making of building loans. Later, these mortgage bankers held a meeting of their own, and, at their request, two representatives of the Citizens' Committee attended that meeting. These representatives there appealed to the bankers to "co-operate with the Citizens' Committee." Some of the bankers advocated assisting the work of the committee by requiring the insertion of a clause in all agreements for building loans, stipulating that the building contract, in connection with which the loan was being made, must be let to a contractor who was pledged to support the Landis Award. A few of those engaged in the business of making building loans advised the committee that they were pursuing that policy. Early in December, 1921, the Citizens' Committee sent out a letter to the bankers advising them that "many of the banks in Chicago" had advised the committee that they had adopted this policy, and urging those to whom the letter was sent to do likewise.

We are of the opinion that when the defendants attempted to extend their influence to the bankers of the city, and thereby cut off the supply of money, in the form of mortgage or other loans, which might be ap-

plied for, by either owners or contractors who chose not to comply with the terms of the Landis Award, they were attempting to injure the carpenters, and any other nonconforming union employees, involved in this controversy, by making a "raid in the rear." The making of building loans had nothing directly to do with either the amount of work to be done or the supply of labor to do it. It had nothing to do with any of the questions in controversy between the union employees and the organized employers and could have no legitimate effect upon the competition which existed between those groups over such questions. It, therefore, tended, without legal justification, to interfere with the freedom to which both owners and independent contractors were entitled, in negotiating for the loan of money. For that reason, we believe all such attempts were illegal. They were just as much so as would have been any efforts to cut off the supply of building material, which apparently the defendants carefully avoided.

It is contended, however, that there was only one letter of the kind above referred to sent out to the bankers, and that was in December, 1921. The defendant Donnelley testified that "the matter was entirely dropped at that time and nothing whatsoever has been done in regard to loans since then, by correspondence or otherwise  *  *  *  there has been no communication of any kind or character with any mortgage bankers in the last three years." The testimony in the record on this point is conflicting. At least as late as March, 1922, Donnelley told a committee of the Chicago City Council that the Citizens' Committee has "advised the mortgage bankers, when they are making a new loan, to insist that building be done under the Landis Award," but he added that they had never put any "pressure" on a bank which had already agreed to make a loan without that restriction, to refuse to advance the money. It might reasonably be in-

ferred from this that the committee did not hesitate to bring "pressure" to bear on a bank, if they could influence the situation before the loan had been agreed upon. Ratcliff gave some testimony as to what some of the contractors had told him, in connection with their refusal to negotiate with complainants, explaining that their loans would be interfered with by the defendants, if they did. While this was competent for the purpose of showing their state of mind, it could not properly be considered as tending to prove that the defendants had, in fact, threatened to interfere with them in that manner. Most of these instances referred to by Ratcliff occurred early in the controversy. However, we think there is sufficient competent evidence in the record to show that this was the committee's policy. It is admitted that it was in the beginning. There is nothing in the record to show that the Citizens' Committee had ever expressly abandoned it, or announced any different policy, or withdrawn the suggestion they had first made. It is true that a court of equity will not enjoin a policy which the evidence shows has been abandoned. *United States of America v. United States Steel Corp.*, 251 U. S. 417, 444; *Industrial Ass'n of San Francisco v. United States*, 268 U. S. 64, 45 Sup. Ct. 403. But in our opinion there was sufficient ground on all the evidence in this record to have justified an order of injunction against the defendants as to this matter, but for the acts of complainants themselves, to which we shall later refer.

In securing carpenters and others willing to work under the Landis Award, to come to Chicago from other places, and in furnishing such workers, in the building trades which were not working under the Landis Award, to those contractors who were, and who were willing to employ them, the Citizens' Committee and the contractors in the Associated Builders organization and the Employers' Association, in our opinion, were clearly within their legal rights and were not in-

terfering with those of the independent contractors or complainants. *Kitchen & Co. v. Local Union No. 141, International Brotherhood of Electrical Workers,* 91 W. Va. 65.

From November, 1921, until the first part of January 1922, the defendants employed investigators, who visited work in process of construction for the purpose of ascertaining and reporting back, as to whether the work was being done under the Landis Award. Where work was found which was not being done under the Landis Award, the case was reported to one of the affiliated associations, and the latter endeavored to have the contractor in question operate his work under the Landis Award. Sometimes representatives of the Citizens' Committee endeavored to accomplish the same thing. The evidence in this record is to the effect that the use of these investigators for the purposes above referred to was discontinued early in 1922. The reason for that was stated, in the course of the oral argument before this court, to be that about that time, in ruling on a motion for a temporary injunction in a similar case, where the use of these investigators was involved, the chancellor had stated it to be his opinion that the things they were doing in connection with their visits to places where construction work was going on, were improper and constituted a form of picketing by the contractors. That reason for discontinuing such a use of the investigators is also referred to by the witness Armstrong, in the course of his testimony. The evidence is that the use of these investigators, which had been carried on up to that time, was then discontinued. It was admitted, however, that investigators were employed by the Citizens' Committee after that time, but for a different purpose, namely, to visit only such work as was being done under the Landis Award, for the purpose of seeing whether the work was progressing satisfactorily, whether such workmen as had been supplied the contractor by the Citizens' Committee,

through its employment bureau, were proving capable, and whether additional men were wanted. So long as the activities of these investigators were confined to the latter field, it was entirely proper. There were six of these investigators employed by the defendants at the time of the hearing of this case in the trial court.

In the course of the controversy between the contractors and the employees, principally the carpenters, and after the Citizens' Committee was organized, the sheriff of Cook county was appealed to for the appointment of a number of special deputy sheriffs, which the employers and the Citizens' Committee claimed were needed for the purpose of guarding and protecting both such work as was being done in Chicago under the Landis Award, and the employees who were engaged in it. Such deputy sheriffs were appointed and so used by the defendants. There were other men, employed by the defendants to protect jobs being done under the Landis Award from damage and, in some instances, to protect men working under the Landis Award from assault. The latter are referred to in the record as "guards," and the witness Armstrong, employed by the Citizens' Committee in the capacity of manager, referred to them as "our own protection department." He testified that the greatest number of men employed in that department was during the spring months in 1922, and that the number fell off rapidly after the first week in May of that year; that "considerably over a hundred" were employed during 1923, and between 130 and 135 in 1924, and, at the time of the hearing of this case in the trial court, the number was eleven. The men appointed as deputy sheriffs were for the most part guards in the employ of defendants. There were 62 of them at one time. Of that number 18 were contractors. These men were appointed upon the recommendation of the Citizens' Committee and at their request. They were armed and each was provided with a deputy's star. Chief

Deputy Sheriff Peters testified that these men were always subject to removal by him and that they were subject to his orders. He admitted, however, that he did not direct their work from day to day, and that he only knew in a general way what they were doing. They were at no time employees of the county but were paid by the Citizens' Committee.

In attempting to justify the appointment of these deputy sheriffs, and their use by the committee in the manner indicated, counsel for defendants call attention to the provision of our statutes (Cahill's St. 1925, ch. 125, ¶ 18), to the effect that in keeping the peace and preventing crime, a sheriff, "may call to his aid, when necessary, any person or the power of the county," and the further provision (Cahill's St. 1925, ch. 38, ¶ 526) to the effect that if in the judgment of the sheriff "the preservation of the peace and good order of society shall require it," he "may summon and enroll any number of special deputies which in his judgment the exigencies of the case require, and such deputies shall be subject to his orders, and shall have all the powers of deputy sheriffs until discharged or excused from duty by the sheriff," and also the provision of the following section, empowering the sheriff to arm the force of special deputies authorized by the act and providing that the county shall pay all the necessary expenses incident to their appointment. It is contended by counsel for defendants that even if it be conceded that the appointment of these special deputies in the manner described was not such as to make them *de jure* officers, they were at least officers *de facto* and consequently their acts were as valid and effectual as though they were officers *de jure*. In our opinion, such a contention is quite beside the point and immaterial. The statutory provisions relied upon do not contemplate or authorize any such procedure, in our opinion. The right of a sheriff to summon a *posse comitatus* under the common law, or to take similar action under

the statute, is well known, but that is not at all what was done here. If work being done by Landis Award contractors, under the provisions of the award, was being illegally interfered with or damaged, or if men engaged in that work were being assaulted—and the record contains a number of instances of that sort of thing—the defendants and the contractors were within their legal rights to employ men to adequately guard their property. If the situation came to be such that this proved insufficient, it was the duty of either the chief of police of the city of Chicago or the sheriff of Cook county, upon learning of the situation or being asked for assistance, to furnish it, either by the use of his regular force of men or, if necessary, by summoning and enrolling "any number of special deputies, which in his judgment the exigencies of the case" required. But in the latter event it would be the duty of the sheriff to maintain such special deputies as his own force, subject at all times to his orders, and acting at all times under his directions, and they should be the employees of the county. The law does not authorize the creation and maintenance of a "protection department," by any private group, whether of employers or employees made up in whole or in part by having the sheriff swear men in as special deputies, authorize them to bear arms, and clothe them with the sheriff's official badge of authority, and turn them over to such group, to be used by them and paid by them, practically as they may see fit.

We come now to the question of unclean hands. In our opinion the complainants in this case might have had injunctive relief as to those matters which we have herein stated to be illegal interferences with their legal rights, by the defendants, except for the fact that the evidence shows that complainants themselves have failed to do equity in this controversy. It may not be successfully contended that the acts of which complaint is made are of no concern here, because they were not

exercised against the Citizens' Committee or any of its members, personally. And this, for two reasons, in our opinion. It is true, as a general rule, as Pomeroy states in his Equity Jurisprudence, sec. 399, that the maxim of "cleans hands" is confined to misconduct connected in some manner with the subject matter of the litigation in which such maxim is invoked, "so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction; it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern." But the acts of complainants, which, in our opinion, must be held to defeat their prayer for equitable relief in this case, were both closely connected with the matter here in litigation and did concern the defendants, although such acts were not directed against the defendants personally and directly. The situation presented in the case at bar is materially different from those which were before the courts in *Mossler v. Jacobs,* 66 Ill. App. 571, and *City of Chicago v. Union Stock Yards & Transit Co.,* 164 Ill. 224, which cases the complainants rely upon, in contending that such inequitable conduct as they may have been guilty of may not be invoked to defeat their plea for relief, because the wrongs complained of were not done to the defendants themselves. If that doctrine could be carried to the length to which complainants thus seek to carry it, and the members of a labor union became engaged in a controversy involving a strike or a lockout, with a large group of employing contractors, and violence or other illegal or inequitable conduct had been indulged in by both sides, either group in filing a bill for an injunction against the other, could prevent the defendants from successfully interposing the maxim of clean hands, by simply leaving out, as parties defendant, those individuals in the defendant group against whom violence or other illegal or in-

equitable conduct had been directed by complainants. A court of equity could, of course, not tolerate any such situation. The defendants in the case at bar were not strangers to the subject matter of the controversy between the complainants and the employing contractors, as represented in the Associated Builders and the Employers' Association, and likewise those employing contractors were not strangers to the subject matter of this litigation. The controversy which gave rise to this suit, and in connection with which the complainants filed their bill in equity, seeking an injunction against the Citizens' Committee, was one involving the complainants and all those in whose behalf they sought relief, on the one side, and the organized employers, represented by the Associated Builders and the Employers' Association, and the Citizens' Committee, on the other. In applying the doctrine of clean hands, in such a situation, a line of demarcation may not reasonably be drawn so as to segregate any of the parts of this latter group. The doctrine of clean hands might successfully be invoked by the Employers' Association, if complainants had filed a bill against the members of that organization alone, even though it were admitted that the inequitable conduct of the complainants, on which the application of the doctrine was based, had been directed against employers affiliated with the Associated Builders and not with the Employers' Association, both groups being equally involved in the pending controversy. In other words, the elements making up the employer group in this controversy were, in our opinion, inseparably connected, and inequitable conduct of complainants, if there were such, would defeat a suit for equitable relief, begun against only a part of the employer group, although such conduct had been directed against some other part of that group. Moreover, as we had occasion to point out in *American University v. Wood,* 216 Ill. App. 189, affirmed in 294 Ill. 186, the maxim of

clean hands is not one intended for the benefit of the individual parties to the litigation but rather for the protection of the court itself. It being our judgment that the Citizens' Committee had a right to organize and the individual defendants had a right to support the Landis Award and lend their aid to the building contractors who were endeavoring to establish the principles of that award, in any manner which did not trespass upon the legal rights of others, a court of equity could not, in our opinion, lend its aid to complainants to restrain such acts of the Citizens' Committee or its members, as we believe did trespass upon the rights of others, if it were also shown that complainants themselves had offended likewise, whether such offense were directed against those whom the complainants chose to make parties defendant or against the building contractors, whom complainants chose not to make parties.

Two other arguments are advanced by the complainants in support of their contention that the maxim of clean hands may not reasonably be applied to the specific instances of alleged improper conduct on which defendants rely in invoking the doctrine. It is contended that some of these instances occurred long before the bill was filed and so should not be considered. Some of them did occur several months before the bill was filed. But there were others which occurred shortly before the bill was filed and others after it was filed. Several such instances happened at the very time this case was being heard by the chancellor. If the defendant, invoking the maxim of clean hands in an attempt to defeat a complainant's bill for equitable relief, can show but an isolated instance or two of misconduct on complainant's part, long prior to the filing of the bill, and the evidence shows that after such instances occurred and up to the filing of the bill or the hearing of the case, the complainant had indulged in no conduct with reference to the matter in

controversy, except such as was proper, it would, of course, be true that the defendant would not be in a position to prevent the granting of the relief prayed for. But where the evidence discloses a series of acts of inequitable conduct on the part of a complainant, covering a considerable period of time but all connected with the protracted controversy between the parties, some of which are recent, the fact that some others may be remote will not prevent them from being taken into consideration, as well as the more recent ones. Moreover, in our opinion, the subject matter of this litigation covers the entire period of the controversy between the contractors and the carpenters.

The other contention of complainants, referred to above, is to the effect that more than 20,000 carpenters, on whose behalf complainants have filed their bill, should not be refused protection from unlawful attacks by the defendants, because a comparative few of their number have indulged in some improper conduct. Without exception, the instances of misconduct relied upon by the defendants, in contending that the complainants have not come into equity with clean hands, were the acts of men selected by this large body of carpenters to represent them, in all such matters as those which were involved in their controversy with the contractors and also in the matters in connection with which the conduct complained of was indulged in. In some of those instances, the acts involved were committed by some of the very individuals who appear here as parties complainant, seeking equitable relief in behalf of both themselves and the 20,000 and more others within the jurisdiction of the district council. Those 20,000 and more may not avoid the effect of the improper conduct of the representatives thus chosen to act for them.

We shall now refer to some of the instances of misconduct on the part of complainants and their associates, which, in our opinion, made it impossible for

a court of equity to lend its aid in granting their prayer for relief from such acts of the defendants as we have indicated we believe to have been improper and illegal.

An incident which took place while the hearing of this case was in progress in the trial court involved one Thompson, a carpenter foreman who did not belong to the union. He was building a bungalow as a home for himself. He had let his plastering contract to a union contractor. One day a business agent, representing the Carpenters' Union visited the job and ascertained that Thompson did not have a union card and that several men working on the job with him were working under the Landis Award. He asked Thompson to join the union and to lay off the men referred to and hire union men. Thompson declined to do either. Some time later the carpenters' business agent stopped the progress of the plastering. The latter testified to the effect that it was his business to see that the plasterers did not return to work on this job. After the work was stopped, the business agent visited the job again and renewed his request that Thompson join the union, which request was again declined. The agent told Thompson that he could not let the plastering go on until the matter of Thompson joining the union was settled. After the plastering had been at a standstill for about ten days, the plasterer finally finished up the job himself.

In September, 1923, a year after this bill was filed, one Lakin, a painter, was working on a job being done by a Landis Award contractor. There were some union carpenters working on the job. Lakin testified that several carpenters approached him and some other Landis Award painters, while they were at work painting some doors, and told them not to paint the doors, for if they did the carpenters would not hang them, and that they told the painters to "get out of the building and stay out." Lakin testified further that another of the carpenters approached one of the Lan-

dis Award painters named Fish and told him "if he put another brush of paint on those doors that he would knock his head off and he drew back as if to hit him," with an iron bar he had in his hand; that the painters then left but returned to work after lunch, under the protection of some deputy sheriffs, who had been sent to the job; that as they started to work "all the carpenters and the men that were in the building started after us, and as they did so the foreman said, 'Let us get those scabs out of here' "; that one of them was armed with an iron hinge about six feet long; that he "drew it back," and as he did so, one of the deputies caught hold of it when it was up over his shoulder as if he was going to strike at Fish; that the deputy then took the carpenter to the police station. This testimony of Lakin was denied by the carpenter foreman, who testified in rebuttal. It was corroborated by Fish. When the carpenter who was arrested in connection with that incident was tried in the police court, the complainant Ratcliff was present.

In the spring of 1922, some construction work was being done on the Trianon Ballroom at 62nd Street and Cottage Grove Avenue in Chicago, under the Landis Award. The carpenter foreman on that job, who was a Landis Award employee, was called out of the building by some union carpenters, who were standing around in front of the building, and told that he had "better stay off of the job or you are going to get into trouble." Some Landis Award carpenters appeared with their boxes of tools to go to work on the job and the union pickets stopped them as they stepped from a street car, and told them to "get the hell out of there," and "assisted" them back onto the car. Two pickets would take hold of a carpenter, one by each arm, put him on the car, give him a kick and tell him to go home. On one occasion on this job, as the foreman stepped out of the door, two men were standing just outside. One of them tripped the fore-

man and threw him to the sidewalk as the second one hit him over the head with something hard, cutting him. Then both of them pounced on him, striking and kicking him. They were armed with brass knuckles. The foreman testified he nearly regained his feet once, "when they hit me in the side of the cheek here where the scar is, and knocked me down again," then they ran around the corner, jumped into a Ford and drove away. The complainant Ratcliff, business agent of the Carpenters' Union, said in the course of his cross-examination: "I picketed the job" (Trianon Ballroom), "when the non-union men were working there for a short time." Another group of five Landis Award carpenters went out to that job, on the elevated road. When they got to the building they were stopped on the sidewalk by eight or ten men who asked them where they were going. They replied that they were "going to work on this job," whereupon the pickets said: "Not by a damn site; we are on this job and you scabby —— —— —— get the hell away from here." The pickets then searched some of the men who had come out to work there, compelled them to go back to the elevated road and leave. One of the witnesses said he saw "probably 30 or 40" of these men scattered along on one side of the building.

In November, 1922, a month after the bill of complaint was filed in this case, some nonunion glaziers were working under the Landis Award, setting glass in steel sash, on a building being erected at Washington Boulevard and Green Street in Chicago. Some union carpenters were working on an upper floor. The carpenter foreman came down on one occasion and threatened to pull his men off the job, "if these scab so-called glaziers work here." One of the glaziers testified that the foreman came down with a hatchet in his hand, "stating if these glaziers work on the job here, he would break all the glass that came in on that floor, and take a hammer and sink it in up to the

hilt in any man's head that might be on the scaffold."
He continued to walk around with the hatchet in his
hand and remarked to some plasterers that were work-
ing there, "We better get off the job if these finks and
scabs are going to work here."

The Anderson & Lind Manufacturing Company are
manufacturers of interior trim. They have always
conducted their business on the open shop basis. One
of the members of that firm told of a conversation he
had with the complainant Jensen, president of the
Carpenters' District Council, in which the latter urged
him to unionize his shop. On another occasion the
witness was visiting a building at which some of their
trim was being installed. He was on the top floor.
One of the business agents of the carpenters came up
and told him that his new boss (Jensen) was down-
stairs. He then said, "He asked me to stop the job.
I told him 'you can go and do your own dirty work.' "
The witness then went downstairs and saw Jensen
talking with some of the carpenters who were working
there. He explained his presence to the witness by
saying he was looking for a man who "had some money
coming on another job." The witness asked Jensen
who the man was. He did not give his name but con-
tinued talking to the carpenters. The witness could
not hear what was said. Finally he asked Jensen if
he did not know Anderson & Lind had an injunction
restraining him from interfering with any of their
jobs. Thereupon, Jensen became very angry, shook
his fist in the face of the witness and told him "he
didn't want to know it and he was going to stop every
job" the witness had, adding, "I will show you that
you haven't got Mr. Brims to deal with now. I am
going to stop every job you have." On that occasion
the carpenters stopped work after Jensen had talked
to them. Brims had formerly been president of the
Carpenters' Union. He was convicted of conspiracy
in the criminal court of Cook county in July, 1922.

Jensen was elected by the carpenters to succeed Brims as president of the union. The witness above referred to told of jobs of theirs which were interfered with at various times during 1923, 1924, and 1925. The events described by this witness were inseparably involved in and connected with the matters in controversy between the union carpenters and the employers which were the basis for the action of the latter in concluding to conduct their business on an open shop basis as far as the carpenters were concerned, and which occasioned the contest over that issue between the two groups and the request of the contractors for assistance from these defendants, and the things the latter group did as a result of that request. One of the three main points of controversy between them had to do with the installation of nonunion-made trim.

Early in 1922, the John B. Murphy Hospital was being built in Chicago, under the Landis Award. A nonunion foreman named Stoddard and a nonunion carpenter named Stone were working on that job. They had secured their positions with the contractor they were working for through what Stoddard referred to as the "Joint Contractors' Association," before the Citizens' Committee was formed. One day a crowd of 25 or 30 men visited the job. It was a very cold day and only Stone and Stoddard were working there. One of the men came in first and told Stoddard to call his men off the job, and said to Stone, "You better get out of here." Stoddard told him he could not call his men off. The man then went out and later returned with the others. One of the men pushed a gun into Stoddard's stomach and said, "We will fix you." Stoddard testified he then felt something pressed against his back—it felt like another gun. Then the man in front struck Stoddard in the mouth with his fist. Then, he testified, "they started forcing me from the room, struck me from all sides * * * and shoved me out into the hall * * * and the blows

rained on me from all sides. They struck me with the butts of guns. * * * They knocked me down. I got up to my feet and they knocked me down again.'' He fell on his back and one of the men, weighing between 175 and 200 pounds jumped on his stomach and kicked him in the side, breaking a rib. He then turned over and got up on his hands and knees and tried to get away and they knocked him down again. He finally got to his feet, ran down the corridor, through a room, out upon the roof of a shed, and from there to the ground and into the construction office, from which he called the police. As he got to the door leading from the corridor, he testified, ''I heard something whistle by my head. It sounded like a bullet,—just sizzled. I heard somebody say, 'don't kill him. We do not want to hang.' '' This attacking party filled seven automobiles. They all left immediately after this assault. Stoddard said one of the men in this crowd was a business agent of the Carpenters' Union named Johanson. Stoddard had his wounds dressed at the old hospital nearby. He required sixteen stitches in his face, lip and head. He was unable to do any active work for the following seven or eight weeks. Stone corroborated the description Stoddard gave of this assault. Stone was also assaulted. He said the men jerked him down from a scaffold, ''poked a gun in my neck * * * and cuffed around all they could. They hit me with different things. One of them hit me over the head with a gun. * * * When I was being cuffed around one fellow said: 'You might just as well finish him off now.' And they said: 'No, don't do that, it will only get us in trouble.' '' Stone was also treated at the hospital. He repeated the names he and Stoddard were called, which need not be set forth here. Stoddard had previously been urged to join the union, by business agents. He was told to either get in the union or get off the job and that if he didn't, ''we would get our blocks knocked off,'' as he put it. The

Carpenters' Union v. Citizens' Committee, 244 Ill. App. 540.

business agent, Johanson, took the witness stand in rebuttal and denied some incidents which had been described by other witnesses as having occurred during the construction of the Ambassador Hotel in Chicago, which were not of a very serious nature, but he said nothing whatever in his testimony in denial of the testimony of Stoddard and Stone, as to what occurred at the Murphy Hospital job.

The Schmidt Brothers Construction Company was engaged in the building business in Chicago and elsewhere. After the Landis Award was handed down they adopted its principles in all their work in Chicago. In 1922, they were engaged in constructing a high school at Joliet, Illinois, and a church at Elgin, Illinois. They used union carpenters on that work. The complainant Ratcliff, with a representative of the Carpenters' International Organization from Indianapolis, Indiana, and another, visited an official of the company and urged him to resume working under union conditions in Chicago. The official testified he told them they were working under the Landis Award and co-operating with the Citizens' Committee because of the situation "brought about by union conditions and that we had agreed to work that way and we intended to continue." The international representative replied that unless Schmidt Brothers signed up with the union in Chicago, "We would have trouble like other contractors who found it necessary to work with the Union, to avoid trouble out of Chicago." On the occasion of a later visit, made for the purpose of seeing what Schmidt Brothers had decided to do about the matter, this same representative, upon being told that they proposed to continue as they were, said: "If that is the case, why, you know, you have some work out of town, and I will have to go out there and pull those men * * * off the job." He mentioned the jobs at Joliet and at Elgin. Later, strikes occurred at both of those places. Schmidt Brothers were

obliged to finish both of those jobs with Landis Award men taken out from Chicago. After these men were taken out there, other trades employed on the jobs also struck. On one occasion, while this difficulty was going on, one of the members of Schmidt Brothers reminded the international representative of the carpenters that sometime previously he had assured them that he would not let the course they might pursue in Chicago influence him to cause trouble on their outside work and that they might continue to figure work outside of Chicago just as they had been doing, and he admitted that he had made those statements and added: ''I am sorry, but the Chicago Carpenters' Union is bringing such heavy pressure to bear that I have got to do it,''—that the matter had later been discussed at Indianapolis and it had been decided that Schmidt Brothers could not be permitted to do work outside of Chicago with union carpenters until they returned to union conditions in Chicago.

Wells Brothers Construction Company was threatened with the same sort of trouble on work they were doing in Cincinnati, Ohio, unless they abandoned the Landis Award in Chicago. The record does not disclose whether those threats were carried out. The Fuller Construction Company supported the Landis Award and co-operated with the Citizens' Committee for a time and then abandoned that policy and returned to union conditions because they had been told that if they did not ''straighten up'' in Chicago their jobs throughout the country would be tied up with strikes. Some of the evidence introduced by defendants in this connection was objectionable, for the same reasons we have referred to in connection with the question of the admissibility of some of the evidence offered by complainants, but some of it was not, and other parts of it were not objected to. Similar testimony was introduced, over objection, as to other instances, but, in our

opinion, it was in such form that the objections should have been sustained.

Starrett Brothers, Incorporated, was an Illinois corporation engaged in the construction business in Chicago. Another concern, known as Starrett Brothers Company, was a New York corporation, doing a similar business in New York. The New York corporation owned one-third of the stock of the Illinois corporation. Paul Starrett was president and his brother Ralph was vice president of both companies. In 1923 and 1924, the Illinois corporation was constructing the Burnham Building in Chicago, under the Landis Award. In January, 1925, a conference was held in the Starrett Brothers' office in the Burnham Building, between the complainant Jensen, president of the Carpenters' Union in Chicago, one Hutchinson, president of the Carpenters' National Organization, both the Starretts, one Dilks, who was connected with the Illinois corporation of the Starretts, and some others. Jensen and Hutchinson wanted to have the Starretts' Illinois corporation unionize their work in Chicago. Paul Starrett had charge of their New York work and it appears he had come to Chicago to urge his brother Ralph, and also Dilks, to return to union conditions in Chicago and dismiss their Landis Award carpenters, because the work the New York corporation was engaged in, in New York, "was all tied up by a strike of the carpenters," because, as Dilks testified; "We were not employing Union carpenters in the Illinois corporation." The outcome of the conference was that Ralph Starrett and Dilks agreed that if the strike against the New York corporation was called off they would operate the next new job they got in Chicago, under union conditions, and would thereafter do all their Illinois work in that manner. Jensen and Hutchinson agreed that with that assurance the New York strike would immediately be called off. Dilks testified that they

"preferred to work along with the Citizens' Committee" for they believed that it made better conditions. Following the agreement above referred to the strike in New York, which had tied up "about eighteen million dollars' work in money value," in New York and Newark, New Jersey, was called off.

Within two months after the happening of the events just referred to, a reorganization of the Starrett Companies took place and the New York corporation ceased to have any interest in the Illinois corporation. The name of the latter was changed to Starrett-Dilks Company. Dilks testified that this change was made to "avoid such entanglements in the future, and annoyance and damage as we had suffered during January and December. I am referring to the strike against the work of the New York corporation, and the efforts to compel the Illinois Company to use Union carpenters. That was the reason for our change in corporate organization."

Some time prior to the January, 1925, conference above referred to, Starrett Brothers, Incorporated of Illinois, had secured a contract to construct a building for the Crane Company in Chicago. Ralph Starrett testified that Jensen and Hutchinson insisted that they must have that job as well as the contracts which might thereafter be obtained by the Starrett Company in Chicago. The Crane job was then in course of construction and the work was being done under the Landis Award. The Starretts explained that the Crane contract had been taken to be done under the Landis Award and they would go through with it. Ralph Starrett testified that he took the position that the situation in New York should have nothing to do with that in Chicago, as their company here was not controlled by the one in New York, but that Hutchinson replied that that might be true, but that he could not convince the rank and file of his union that such was

the case and that the New York strike would "not be called off unless we agreed to employ Union men in Chicago."

These outside strikes where there was no complaint at all on the part of the carpenters involved were in the nature of sympathetic strikes, for which, in our opinion, there was no legal justification. Here we find another example of "an attack in the rear,"—this time on the part of complainants. They were a species of coercion having nothing to do with the competition between the two groups involved in the controversy in Chicago. They constituted a means which the complainants employed to injure the employing contractors, which could have no direct and immediate effect upon the amount of work to be done in Chicago or the supply of carpenter labor to do it. They therefore constituted such an interference with freedom of contract as the law will not permit.

In our opinion, these incidents to which we have referred, show such a course of conduct on the part of complainants, through the period of the controversy involved in this action, as necessarily precluded a court of equity from affording them the relief for which they prayed, even though some of the activities of the defendants were, as we have indicated, an illegal invasion of complainants' rights.

A prayer for "evenhanded justice" involves an appreciation of the legal rights of others, as well as one's own. It necessitates an observation of the restraints put by the law upon one's own conduct, as well as those we ask others to observe. Equity may properly grant relief by injunction to employers, only when they can show both an infringement of their legal rights, and an observance, on their own part, of the legal rights of the employees. No different rule may be applied to the latter when they come into equity for similar relief. "In the fullest recognition of the equality and

mutuality of their rights and their restrictions, lies the peace of capital and labor.''

For the reasons we have given, the decree of the superior court is affirmed.

*Decree affirmed.*

O'CONNOR, J., concurs.

MR. PRESIDING JUSTICE TAYLOR concurring in part and dissenting in part: I am of the opinion—on this subject agreeing with the majority opinion—that the activities and conduct of the Citizens' Committee to enforce the Landis Award, a corporation not for pecuniary profit, and the 179 men who composed it, from November, 1921, when the corporation was formed, up to February 19, 1926, when the final decree dismissing the bill for want of equity was entered, constituted a continuous and injurious invasion, infringement and impairment of the common law and constitutional trade rights and freedom of the union carpenters of the city of Chicago and vicinity.

As the record contains nearly 4,000 typewritten pages, and covers a great deal of the history of the building trades in Chicago and vicinity, from the year 1918 up to, and including part of, the year 1926, and the history of the relations between approximately 20,000 carpenters and of their unions, on the one hand, and the Citizens' Committee to Enforce the Landis Award, and its 179 members, a large number of contractors and builders, two societies of architects, certain bankers and mortgage bankers, a large number of special deputy sheriffs and guards, and a large number of imported nonunion carpenters, on the other; and involves in an intimate way many public utterances, many private meetings, many advertisements, and considerable literature sent out by the Citizen's Committee, the acts and purposes of the Carpenters' Union, and those of the Citizens' Committee to Enforce the Landis Award; it is impossible to set

forth in a judicial opinion, within reasonable limits, more than the pertinent salient facts.

The following is a skeleton statement of the evidence showing the motives, intentions and conduct of the Citizens' Committee:

(1)   In the fall of 1921, it established elaborate headquarters, with a large office force, with a paid manager, became incorporated as a corporation not for pecuniary profit, took over certain contractors' pledges, which bound the contractors among themselves to have no negotiations with representatives of certain unions, among them the union carpenters, who refused to recognize the Landis Award and its recommendations, and, also, took over a workmen's employment bureau that an association of contractors had started.

(2)   From November, 1921, to January 10, 1922, it employed paid investigators, sent them out—having districted the city—to report on all jobs, whether proceeding under the Landis Award or not. As to the cases reported to be proceeding outside the award, the Citizens' Committee wrote to those contractors pertaining to their violations, and sent the investigators' reports to the contractors' association, asking it to use its influence. Illustrative of the contents of letters written to contractors is one sent to one Gonsalve, which contains the following: "This committee asks you to please change your present practices. * * * Ours is an absolutely non-partisan group, composed of 179 of the leading business and professional men of this City, interested solely in seeing that the Landis Award is lived up to in all its phases," and it also contained the following: "Because of the attitude of the District Council in months past, we are maintaining an open shop in this (meaning the carpenters) trade."

(3)   After its organization, it began soliciting funds and to hold meetings with contractors' associations,

architects and bankers, and to publish extensive advertisements in the daily papers. It obtained by public subscription, up to the time of the hearing, about $3,000,000 for its activities.

(4) In the fall of 1921, and the spring of 1922, it put forth, according to its manager, "a perfectly enormous propaganda."

(5) At a great public meeting, a thousand persons present, which it held on November 16, 1921, Donnelley, its president, stated that the Citizens' Committee had definitely declared the open shop in those trades that were not in, and in those trades their foremen would be nonunion men, and that the Citizens' Committee would not deal with any representative of those unions, and that the contractors had agreed with the Citizens' Committee *"that henceforth they would allow the Citizens' Committee to dictate their labor policies"*; that if the contractors repudiate their agreement, the Citizens' Committee will find other contractors in Chicago, or employ them from outside; that the Citizens' Committee would use its influence to see that the contractors who thereafter complied with their agreements got the major part of the business.

(6) The Citizens' Committee sent letters to the architects, asking them to sign a pledge and enforce the Landis Award. The pledge sent out by the Citizens' Committee provided that the architects in awarding contracts should insist that the work should be done under the Landis Award and its recommendations, and that each contract should provide that it could be canceled if the contractor failed to abide by the terms of the Award.

(7) There was evidence by one contractor, Strandberg, that his firm took the pledge because there were such influential men on the Citizens' Committee it would have great bearing on their getting future work, and that, subsequently, dropping their name from the Citizens' Committee list of contractors, decreased

their business, particularly in getting jobs from so-called Landis Award architects.

(8) Representatives of the Citizens' Committee conferred with the Mortgage Bankers' Association, in December, 1921, and appealed to it to co-operate. The Citizens' Committee sent out 102 letters to the bankers, asking them to support the Citizens' Committee, and to insist that borrowers in the case of building operations let their contract only to those who have signed up with the Citizens' Committee. The bankers were informed that "because of the attitude of the carpenters district council in months past, we are maintaining an open shop in this trade."

(9) It established a subcontractors' department. Certain subcontractors had an organization which was endeavoring to get work for such subcontractors as were operating under the Landis Award, in co-operating with the Citizens' Committee. The Citizens' Committee paid the expenses of the employees in that department. The Citizens' Committee maintained a promotion department, which had a complete statistical organization, and through it kept a record of every job of $25,000 and over, going on in Cook county. It received considerable information from a similar organization of the architects. The architects would advise the Citizens' Committee's promotion department of jobs in their offices, and inform the Citizens' Committee that the architects would want a number of Landis Award general contractors, and a certain number of its subcontractors. The promotion department would then send out and interview contractors it believed most capable of handling the particular job, and find out if they would bid, and, if they would, it would then notify the architects' promotion department, who in turn, would notify the particular architects. The promotion department would get knowledge of a good many jobs of which the architects' promotion depart-

ment had no knowledge, and would turn over its information to the architects for them to follow up.

(10)   It established its own employment bureau, got carpenters, by the thousands, from other cities, advanced them certain expenses, examined them as to their qualifications, got pledges from them to work only under Landis recommendations as to wages and rules, furnished them working cards and arranged that contractors could not employ them without the bureau's permission.

(11)   It established its own insurance department, placed insurance for contractors against sabotage, free of charge.

(12)   It furnished guards—having at one time 471 —free of charge. It got the sheriff of Cook county to create 62 special deputy sheriffs, which it paid, and furnished with small arms, 18 of them being contractors.

(13)   It put in the daily papers text that reflected injuriously upon and defamed the union carpenters; announced that the Carpenters' Union was the only union that was "outlawed"; that it would never be able to negotiate a wage agreement again; that certain contractors who employed union men hampered the Citizens' Committee; that it was the duty of every builder to insist that his work be done by contractors who had signed up with the Citizens' Committee. Some of the published texts referred, by obvious interpretation, to the union carpenters as part of a "crime syndicate." Others urged that a strong campaign be waged among the contractors, to get them to sign up with the Citizens' Committee, and intimated that those that did not declared themselves as bad citizens.

(14)   It furnished signs for the contractors to put up on their jobs, showing them to be under the Citizens' Committee. Letters were sent out appealing for money, in which it was set forth that the Citizens' Com-

mittee sent out a weekly letter, to architects and contractors who were pledged, which stated that it kept a corps of investigators giving all their time to calling on architects and contractors to have their work done under the Landis Award. It used the contractors to collect expense money, such as railroad fare, which it had advanced to carpenters.

(15) A letter of June, 1922, gave the text of a clause for the architects to use so as to bring all contracts under the Landis Award and its recommendations. In July or August, 1922, it sent a letter to the architects and contractors stating that a conference of officers of the building trades to settle the Chicago situation had just been held, and it had recommended that contractors and others under the Landis Award refuse to have dealings with the representatives of the "outlaw" trades, which included the carpenters. It also told them to inform the nonunion carpenters not to join the Carpenters' Union. It also stated that they had increased the number of salesmen on the street, put in a complete card system, and were able to furnish complete information on every job, from its inception until the contract was awarded; that twice a week they would mail a list of the various jobs ready for bids; that the reports of jobs the contractors and architects sent in for checking would be kept confidential.

(16) Although it was admitted by the Citizens' Committee that since the summer of 1922 it had greatly reduced its advertising propaganda, the evidence showed that up to the time of the final hearing its general policy, as stated by its president, had not changed, save in a minor way, since it was first announced, and that it was still functioning as a present going concern.

That summary shows the creation and working of a great force to thwart the union carpenters in many ways, but especially to restrain them in their trade,

to prevent them from having normal access to prospective employers, to defame them as a class, to organize public opinion against them, to prevent their representatives from negotiating contracts with organizations of contractors, and to destroy their unions, and all by a combination of well-known business men, who sincerely believed their motives to be good, who had no direct relationship with the building industry, and who were, as to their own matters of employment, not interested in the employment of carpenters.

Many decisions of the courts have been cited by counsel in their able and exhaustive briefs, but none of them deals with a similar state of facts. Apparently, the activities of such an institution have never before been presented to a court of review.

Considering the evidence, as summarized above, Does it show that the Citizens' Committee was illegally violating the rights of the union carpenters? Although it is generally assumed that restraint of trade —using that phrase as referring to restrictions upon the disposition of labor, as well as upon the disposition of all other matters of trade—may be according to the general principles of the common law, under certain circumstances, unlawful, on the ground that every person has the right to require that the course of trade shall be kept free from unreasonable obstruction, yet, as stated by Erle in his celebrated work on Trade Unions (p. 6), "Neither a grant of this right, nor a prohibition of the violation thereof, is found in the direct terms of a law; but proceedings for the violation of the right are recorded, and in these proceedings the grant of the right, and the prohibition of the violation thereof, are assumed to exist."

As to the right, the correlative duty, the invasion of the right, and the remedy, Erle said (p. 12), "Every person has a right under the law, as between him and his fellow subjects, to full freedom in disposing of his own labor or his own capital according to his own

will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another in the exercise of the right comprised within this description—done, not in the exercise of the actor's own right, but for the purpose of obstruction,—would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition and, the violation of this prohibition by a single person is a wrong, to be remedied either by action or by indictment, as the case may be. It is equally a wrong whether it be done by one or by many—subject to this observation, that a combination of many to do a wrong, in a matter where the public has an interest, is a substantive offence of conspiracy. It is equally a wrong, whether the obstruction be by means of an act unlawful in itself, on the part of the party obstructing, or by means of any act not otherwise unlawful.'' Oakes Organized Labor (1927, Ch. 31); Mason, Organized Labor, 157 (1925).

As to the trade of the union carpenters, they had the right to establish their brotherhood, district councils, and unions, and had the right to agree among themselves to certain rules, and to be bound by them, and they had the right as a voluntary association through representatives of their district council, to be allowed, particularly in the community in which they live, full freedom and liberty—that is, to be free from the molestation of combinations, or conspiracies of men, especially of men, as in this case, who were not engaged in the building industry—to undertake negotiations with contractors and contractors' associations, looking towards the consummation of contracts between them, which would tend to stabilize and fix wages and establish rules of conduct as to future work, that is, they had the right to undertake negotiations

leading up to what may be called a collective bargain, that is, an inviolable right, and it is reciprocal, as both contractors and contractors' associations have a similar freedom and right to undertake negotiations in collective bargaining with the union carpenters. The foregoing, we think, is axiomatic.

Further, not only did the union carpenters as an association have the right, unmolested, to undertake collective bargaining, but each union carpenter had the right, freely and unmolested, to seek employment, and the right that prospective employers should remain free from certain influences adverse to his employment, that is, influences created and exercised by a combination or conspiracy of third persons intended to keep him from getting work on any other terms than those prescribed by the combination. Such are, in part, their trade rights, and one of the obvious reasons for their existence is that, if a combination of third persons were permitted with impunity, even from supposedly good motives, to band themselves together in large numbers as a company or in the form of a corporation not for profit, to bring about trade regulations between others against the desire of either set or both, there would be grave danger that the freedom of contract, the liberty to negotiate, that is a characteristic of our society, would be gravely endangered. If allowed such authority, they at once become a superior power, with rights above those of either employer or employee; and it would permit, carried to the extreme, a combination of outsiders to dictate and control wages and prescribe the conduct of workingmen in every trade.

Possessing, therefore, such rights of trade, were the activities and conduct of the Citizens' Committee inimical to those rights? Were they a continuing, illegal, injurious infringement and impairment of them?

This is not a suit against the contractors, either those of the Associated Builders, or the Builders Em-

ployers' Association, or against the architects, or the bankers. What the rights of the contractors would be by way of defense are not in any way involved. They, if sued, might set up as a justification of their conduct many things, such as, for example, their right to agree amongst themselves not to pay over $1 an hour, and not to employ union carpenters, and their right to establish a general employment bureau, and to undertake to get carpenters from other cities, and to get insurance, collectively, against sabotage, and to employ men as guards, and to advertise, in a reasonable way, the reasons why they were doing those things; the chief reason being that they were in a labor conflict with the union carpenters, and not able to adjust their employment relations. But even they would not be entitled to advertise that the union carpenters were ''outlaws,'' to defame them, nor to agree never to bargain with them collectively, and so ostracize them. But this being a suit in which a court of equity is asked to prevent the Citizens' Committee from molesting the union carpenters, the things that they may lawfully do are limited to those which are the common rights of all, and which are not dependent in any way upon a special trade conflict or controversy between parties who have a direct mutual interest in the subject matter of the dispute.

It must be borne in mind that this is a suit against the Citizens' Committee, a large combination of men not in the building trades, and it is claimed that it may not lawfully solicit and obtain pledges from contractors, not to deal with union carpenters, as such, singly or collectively, nor undertake to coerce contractors to so pledge themselves; nor solicit and take pledges, with a like result, from architects and bankers; nor through the press, mail, or by public speeches, defame, as a class, union carpenters; nor endeavor by public utterances, in part defamatory, to create a public opinion adverse to the employment of union carpenters; nor

run a great employment agency by which, through special agents and the advancement of railroad fare, thousands of carpenters were brought in from neighboring states, with the announced purpose of "outlawing" union carpenters and destroying their union; nor to have appointed, at their instigation, special deputy sheriffs, whom they armed, and whose wages they paid.

It is not necessarily the effect of any single act of the Citizens' Committee, considered by itself, that is important, but rather what was the effect of the whole machine, as it were; all the activities of the Citizens' Committee upon the lawful freedom of the union carpenters in their particular world of trade. Looked at in that light, it seems obvious that their rights, in many ways, subtle, as well as open, were unjustifiably, and injuriously infringed, invaded and impaired. Although according to their moral standards, the defendants did not have a bad motive, that does not mean that they did not intend to harm the union carpenters. "The intention is the aim of the act, of which the motive is the spring." Austin, Juris. Pr. 3 Eng. Ed. p. 165. Their intention clearly was, as to part of their activities, that union carpenters, as such, should not be employed, and that no negotiations should take place looking to collective bargaining. Their motive was, no doubt, that thereby, that being brought about, wages would be lowered and the quantity of building increased.

In my judgment, the general conduct of the Citizens' Committee, as stated above, unlawfully interfered with the freedom and rights of the union carpenters; it injured their good name; it persuaded or coerced contractors not to employ them; it ostracized them; it decreased their opportunities to get employment on terms their unions agreed were reasonable; it prevented them from collectively bargaining through their unions' representatives with the contractors' associa-

tions; it poisoned the minds of contractors against them; it pledged contractors and architects not to deal with them; it produced something in the nature of a boycott and blacklist, both combined, preventing the union carpenters from getting work, and so was a continuing tort for which there was no adequate remedy at law.

In *Berry v. Donovan,* 188 Mass. 353, 357, the court said, "No one can legally interfere with the employment of another unless in the exercise of some right of his own, which the law respects." In my opinion, the activities and conduct of the Citizens' Committee exceeded the proper limits of liberty or self-defense or economic competition—Smith, 20 Har. L. Rev. 359—and resulted in a continuing, injurious infringement and impairment of the rights of the union carpenters. It may be true that the Citizens' Committee thought that their effort to enforce the recommendations of the Landis Award as to the union carpenters and ten or more other outside trades would tend to lessen the cost of building, and to reduce rents—although it would necessarily decrease the ability of the workingmen to pay for anything—but what of all that, if it entailed taking away any part of the constitutional and common-law freedom of the workingmen. As the law stands today, workingmen and employers have well-known rights; both are quite free to deal with each other without the collective interference of outsiders. In reality, under our law, there are neither masters nor servants, but only equals; and so the law certainly looks with especial disfavor on a combination of outsiders, that is a body of men not directly interested in a particular labor controversy, who arrogate to themselves authority to bring about what they want as to wages and terms, against the desire of either employer or employee, or both.

The law prohibiting such activities and conduct as that of the Citizens' Committee is based chiefly on the

economic postulate that workingmen's freedom is worth more to society than it, pecuniarily, may seem to cost.

The defendants might speak or write in reasonable advocacy of the award; they might publish anything not libelous in an endeavor to persuade and convince workingmen, union carpenters, contractors, architects, bankers, and others, of the virtue of the award and its recommendations, but they were not entitled to combine and conspire, and bring into being an institution which, in and of itself, actually, overtly, as the result of premeditation and design, molested, hampered and restrained the legitimate, constitutional, and common-law freedom and normal liberty of the union carpenters. Further, the General Act of 1874, entitled "Conspiracy," provides that "If any two or more persons conspire or agree together, or the officers or executive committee of any society or organization or corporation, shall issue or utter any circular or edict, as the action of or instruction to its members, or any other persons, societies, organizations, or corporation, for the purpose of establishing a so-called boycott or blacklist * * * or to do any illegal act injurious to the public trade * * * they shall be guilty of a conspiracy" and punished. Cahill St. ch. 38, ¶ 116.

In *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n of North America,* — U. S. —, 71 L. Ed. —, 47 Sup. Ct. 97, the court said, "An act which lawfully might be done by one, may when done by many acting in concert, take on the form of a conspiracy and become a public wrong, and may be prohibited if the result be hurtful to the public, or to individuals against whom such concerted action is directed." *Carlson v. Carpenter Contractors' Ass'n of Chicago,* 305 Ill. 331; *Carlson v. Carpenter Contractors' Ass'n,* 224 Ill. App. 430; *Franklin Union, No. 4 v. People,* 220 Ill. 355; *Purington v. Hinchliff,* 219 Ill. 159.

In my judgment, such a combination as the Citizens' Committee has no legal standing in our, so-called, individualistic society, which seems to be founded in great part on practically complete trade freedom for both employees and employers, unmolested and unrestricted by the dictation of any arbitrary combination of men who are not directly interested; for, if such a combination were permitted to function in opposition to the reasonable liberty of workingmen, it might ultimately become—to use a phrase of Mr. Justice Brandeis in his dissenting opinion in *Bedford Stone Co. v. Journeymen Stone Cutters' Ass'n of North America, supra,* in referring to the Sherman Law and the Clayton Act—"an instrument for imposing restraints upon labor which reminds of involuntary servitude."

This court holds, according to the majority opinion —and it is here only that I dissent—that even though the Citizens' Committee was engaged in illegal practices, as regards the union carpenters, and had injuriously invaded their rights, yet the union carpenters are not entitled to the injunction they seek, because they do not come into equity with clean hands; that is, they have been guilty of such misconduct in conjunction with the matters involved between the union carpenters and the Citizens' Committee, that a court of equity will not listen to them, will not entertain their claim to an injunction, or to any relief, but leave them to whatever remedy they may have at law. With that holding, as stated above, I am unable to agree.

It is not claimed that the union carpenters, or any of them, ever committed any tort against, or broke any contract with, or interfered with any right of the Citizens' Committee. There were no contractual relations of any kind between the Citizens' Committee and any contractor, or carpenter, union or otherwise. No rights of the Citizens' Committee, or any of its members, were shown to have been affected in any way, injuriously or otherwise, by any union carpenter. In

other words, the evidence shows that the Citizens' Committee, made up entirely of third persons, at no time had any legal or business relationship with union carpenters, and so could not at any time have been injuriously affected by anything, good or bad, that occurred between union carpenters and carpenters employed by contractors.

The Citizens' Committee was an institution separate and apart from the union carpenters, contractors, architects and bankers. Its purpose was unique. It undertook to persuade, coerce, and to intimidate contractors, as well as union carpenters. It was, in and of itself, a single going concern, with its own exchequer, agents and employees. The function of the union carpenters was carpentry; that of the contractors, putting up buildings; that of the architects and bankers, the particular work of their special lines of business; but the avowed function of the Citizens' Committee, as far as the union carpenters were concerned, and that is all we are interested in here, was to prevent union carpenters from being employed, unless they were willing to work for $1 an hour and upon the terms prescribed in the recommendations of an arbitration award, with which they had nothing to do, and to prevent them, through their official representatives, from negotiating with the representatives of the associations of contractors for mutually satisfactory general contracts of employment, that is, to prevent collective bargaining.

It had no pecuniary property or business interest in carpenters, contractors, architects or bankers. It wished to lessen the cost of building. Apparently, its theory was that if the wages of union carpenters, and those of the ten or more other trades not subject to the Landis Award, were put down to $1 an hour that, as a result, there would be more building in Chicago and vicinity, and that that would be a good thing for Chicago, and would make more money for somebody.

The result was that it used its activities and influence to keep wages down throughout the building industry, not only as to carpenters, but as to the ten or more trades, and so it became a brand new form of obstacle to peace between workingmen and employers; a brand new form of organization within the State, the sole purpose of which was, practically considered, to keep down and dictate the wages of certain classes of workingmen. It would not be invective or hyperbole, even bearing in mind the good motives of its members, to call it a form of dictatorship. The union workingmen, the contractors, the architects, the bankers, owners, and the public, in a sense, became both its objects and its subjects. Being such an institution, exercising *ultra vires* and unlawful activities, invading the plain rights of the union carpenters, Is it reasonable to hold that its existence and wrongs are immune because some union carpenters were guilty of misconduct as to certain nonunion carpenters which it did not employ?

Counsel for the defendants cite *Scranton Electric Light & Heat Co. v. Scranton Illuminating Heat & Power Co.*, 122 Pa. St. 154, and the *American University v. Wood*, 294 Ill. 186, as supporting their contention that a court of equity ought not to take jurisdiction of the complainant's claim. But in both of those cases, it was held that the acts of the complainants showed them, as corporations, to be frauds on the public. In the *American University* case, it was held that as the business of the corporation was "a fraud on the public," a court of equity would not protect it. In the instant case, neither the union carpenters, nor their unions, nor their district council, nor their brotherhood, is a fraud upon the public. They are all recognized as lawful persons or parties. Mr. Justice Farmer said, in the *American University* case, where the complainant company was a fraud, *per se,* "The misrepresentations of complainant in the conduct of its business affected the public, and it would seem a

strange thing if a court of conscience should be required to protect a suitor in the commission of a fraud upon the public. * * * It is no part of its function to aid a litigant in the promotion of a fraud upon the public.'' In that case the court announced that there are two rules of law, the first is, that if the business of the party suing is a fraud upon the public, it has no standing in equity; the second is, that if the business of the party suing is legitimate, then a court of equity will entertain it as a suitor, unless it is shown that it has been guilty of fraud, or wrong-doing, ''connected with the subject of the litigation, and has some relation to the rights of the parties arising out of the transaction.'' Not only is the Carpenters' Union not a fraud upon the public, but neither the rights of the union carpenters as against the Citizens' Committee, nor those of the latter against the former, were in any way involved in the conduct of the union carpenters towards workmen employed by the contractors.

As to the facts, suppose the converse: That the Citizens' Committee had been organized to raise the wages of the 25,000 union carpenters of Chicago, and had solicited and obtained pledges from them and their district council not to work for the contractors of Chicago, save according to their own agreed upon terms, and not to do any collective bargaining with them, and to ''outlaw'' the employers' associations, and had established a great going concern with its own offices and a retinue of clerks, all paid for by a great publicly subscribed fund, and sent out emissaries to many States to get union carpenters of Chicago jobs elsewhere, and had sent out train loads of union carpenters, advancing them railroad fare, from Chicago, so that, as a result, the Chicago contractors could not get enough carpenters, and had put forth an enormous propaganda for the union carpenters' benefit, and condemned in defamatory language the contractors, could it be reasonably claimed that the rights of the contrac-

tors had not been illegally impaired and invaded? Could it be claimed, after that had been going on for a number of years, that because a few of the contractors had maltreated some union carpenters that the contractors, as a body, had lost all right in equity to an injunction against the Citizens' Committee, a body of strangers? This supposititious and the instant case invoke, practically, the same principles of law.

Whatever the source of the Citizens' Committee may have been; at the time the suit was begun and from then on, and at the time of the final hearing, it was an absolutely independent going concern, coercing contractors and architects, as well as union carpenters, intent on exploiting the Landis Award and its recommendations, regardless of what might be the normal desires of any of the other parties. By what kind of logic, therefore, may it now successfully contend that it is immune to suit on the part of those it has continued to injure? It is not sufficient for it to say to the union carpenters, "You have injured others." A court of equity recognizes no such defense. If it did, only the completely virtuous could ever obtain a remedy in such a court.

Considering the purpose for which the Citizens' Committee was organized, and what its activities were, unless it successfully coerced, or, at least, induced, and pledged contractors, it was a useless entity. Also, unless it successfully boycotted, or blacklisted, or ostracized in some way the union carpenters and kept them from being employed at more than $1 an hour, it was a failure. The evidence shows, however, that it was not only efficient, but successful. A reasonable inference from that is, that as a going concern it affected and controlled, to a considerable extent, all the parties to the labor controversy which existed between the union carpenters and employers of carpenters; in other words, it existed in the community as a separate organized force, with its own unique purposes and ac-

tivities, sharing its responsibilities with no one else, amenable to the law as a corporate entity, and as an association of individuals, and was subject to suit by the union carpenters for any wrongs it committed, regardless of any and all relations between the union carpenters and the contractors.

Further, even if the charges of misconduct on the part of the union carpenters towards certain contractors and nonunion carpenters were to be considered as affecting, in some circuitous way, the Citizens' Committee, an analysis of the evidence in the record shows only four charges of misconduct worthy of serious consideration; those of the Murphy Hospital, the Starrett Brothers Company, the Goodman Manufacturing Company, and the Trianon Building. The Murphy incident was outrageous, but the evidence shows that it occurred nine months before the bill was filed. The Starrett Brothers Company matter is somewhat confusing and conflicting. The evidence does show, however, that at the time of the strike in New York there were two companies each with the same name, Starrett Brothers Company; one apparently doing business in New York, and the other in Illinois, Paul Starrett being president of both corporations, and the New York corporation owning one-third of the stock of the Illinois corporation; that although the Illinois corporation was changed from Starrett Brothers Company to Starrett-Dilks Company, it was not changed until March, 1925, which was after the time when the strike against the work of Starrett Brothers Company in New York was called off. Evidently, when the New York strike was on, the two companies had the same name, and were, to a large extent, one organization, so that under the law, it could hardly be considered that the strike in New York, in order to influence the employment of men in Chicago, was at all in the nature of a sympathetic strike. However, the evidence on the whole subject is so vague and uncertain that it is im-

possible to consider the transaction as any definite evidence of misconduct on the part of the complainants.    Further, it may have been entirely lawful. *Lehigh Structural Steel Co. v. Atlantic Smelting & Refining Works,* 92 N. J. Eq. 131, 134; *Krug Furniture Co. v. Berlin Union,* 5 Ont. L. Rep. 463.

As to the dispute at the Goodman Manufacturing Company, which was a dispute between some Landis Award painters, on the one hand, and union carpenters on the other, the evidence is conflicting.   The testimony of Fish and Lakin painters is categorically denied by Peterson, a carpenter foreman, and we are not able to say, under the circumstances, just what the truth is.

As to the Trianon Building incident, the evidence shows that there was some misconduct, with no serious harm done, on the part of a number of carpenters, and that, as in the *Murphy* case, it occurred about nine months before the bill was filed.

Although, therefore, at first blush, the instances of misconduct towards some contractors and nonunion carpenters, recited in the brief of counsel for the defendants may seem imposing, an analysis of the evidence discloses, as stated above, only four instances worthy of serious consideration, two of which occurred at least nine months before the bill was filed, and the other two failing somewhat in proof.

In other words, from the handing down of the Landis Award, and the creation of the Citizens' Committee, to the time of the decree, February 19, 1926, a period of over four years, misconduct on the part of the carpenters had been practically negligible, save in two instances, although, during nearly all of that time, there were over 20,000 union carpenters in Chicago and vicinity, endeavoring, it must be presumed, to work and make a livelihood at wages they, collectively, considering the cost of living, agreed among themselves were reasonable, and although against them throughout the

same long period of time, the Citizens' Committee, as an entity, was using, unlawfully, its manifold activities to hamper and keep them from work at the wages and terms they claimed, to keep them from having any reasonable opportunities to negotiate for collective agreements with the contractors; to influence the public mind against them as an association or aggregation of unions, sometimes by defamation; to persuade owners, to coerce building contractors, to urge architects, and part of the time, bankers, to be against them.

Considering, therefore, the work done by the Citizens' Committee, doing unlawful things, as this court holds; its direct and single attack upon the union carpenters of Chicago and vicinity; the vast sums it has spent in an endeavor to carry out its illegal purposes, its methods of persuasion, and its propaganda, including at times veiled threats to the contractors; its efficient employment bureau; its advertisements and solicitors in other States, so as to bring in carpenters amenable to its dictation; its advancement of railroad fares to prospective employees for the contractors; its registry system; its cards of identification; its constant surveillance of building going on and contemplated; its insurance, furnished free; its special deputy sheriffs, armed as guards, and furnished free; its efforts to prevent collective bargaining between the carpenters unions and contractors; its public condemnation of the union carpenters; its domination of the whole subject of union carpenters employment, is it abnormal that, with 20,000 resident union carpenters, threatened with extinction as a series of unions or as an association, and threatened with continued unemployment, unless they accepted employment on terms they considered unreasonable, there should occur in the course of over four years so small an amount of misconduct, all of which may be said to have had its source, at least, indirectly, in the illegal activities of the Citizens' Committee itself? Such being the case, would it not be a

manifest injustice for a court of equity to say that the rank and file of the union carpenters of Chicago and vicinity who are complainants, cannot be heard against the Citizens' Committee, by whom they are being continuously injured, and against whom they have done no wrong?

When it is borne in mind that, after a close examination of the record, those recited above are substantially all the charges of misconduct on the part of over 20,000 union carpenters, occurring in the course of over four years,—during which time thousands of buildings costing many hundreds of millions of dollars have been built in Chicago and its vicinity, and during which time the Citizens' Committee has undertaken to thwart their getting employment on terms they considered reasonable, and scoured the neighboring States to get carpenters to do the work at lower wages, and has brought in thousands who have been so employed, to do carpentry work, which would, presumably, in the normal order of things, have gone, in great part, to the union carpenters,—we are inclined to think it is somewhat surprising, knowing what controversies between workmen and employers usually, seemingly inevitably, bring about, to find by and large such an unusual and general exhibition of self-control. Further, when it is considered that the Citizens' Committee, the defendants themselves, have been left unmolested, unattacked, and allowed to pursue, as exhaustively and as efficiently as possible, on a gigantic scale, their illegal practices, without let or hindrance, and with the assistance of something in the nature of a private police force and a publicly subscribed fund of about $3,000,000, it does not lie in their mouths to say, "You have done nothing to us, you have caused us no temporal damage, but as you sinned somewhat against a few non-union carpenters and contractors, which fault was caused, at least in part, by our wrong-doing, a court of equity ought to refuse you any remedy

against us, ought to refuse to restrain us from our unlawful and hurtful activities.''

It is contended for the Citizens' Committee that the Carpenters' Union is a gigantic conspiracy; that one of its purposes is to coerce individuals and corporations to surrender legal rights; that it interferes with public liberty; that it is a monopoly. It is the law that an association of workmen, such as carpenters, is not a monopoly. In *National Fireproofing Co. v. Mason Builders' Ass'n,* 169 Fed. 259, the court said, ''Members of unions cannot be said to be monopolists when any qualified bricklayer can join a union.'' In *Lohse Patent Door Co. v. Fuelle,* 215 Mo. 421, which was a suit against the Carpenters' District Council of St. Louis, the United Brotherhood, etc., and certain individuals, charging restraint of trade, monopoly and conspiracy, the court, in considering the rules of the carpenters, and whether they, through their association constituted a monopoly, held that the United Brotherhood of Carpenters and Joiners and its allied associations are not an unlawful combination, or a monopoly. The court quoted with approval the following language: ''But there is nothing here on which a monopoly can attach. The business is one of mere personal service—an occupation. Unless there is 'property' to be 'affected with a public interest there is no basis laid for the fact or the charge of a monopoly.' '' It is further said, ''While it might be conceded that labor organizations might be proper subjects for legislative control and regulation, yet the Legislature has not in its wisdom seen proper to do so; and at common law personal service—an occupation—could not be the subject of a monopoly.''

In *Paine Lumber Co. v. Neal,* 244 U. S. 459, where an injunction was sought against the same United Brotherhood, on the ground of restraint of trade, monopoly and other charges, and where practically the same constitution, rules and regulations—which included

the rule as to nonunion material—were involved, the court, in an opinion by Mr. Justice Holmes said, "Certainly the conduct complained of has no tendency to produce a monopoly of manufacture or building, since the more successful it is the more competitors are introduced into the trade."

As to the rules of the Carpenters' Union being illegal and tending to produce a monopoly or to restrain trade, they have been generally held to be legally unobjectionable. Of course, many of them are obnoxious to employers, but that does not render them invalid. It may be that more building would be done, if they were abrogated, but that certainly is not a sufficient reason for lessening anyone's freedom.

In *Bossert v. Dhuy*, 221 N. Y. 342, the rules, practically all those chiefly criticised by the defendants, were passed upon and held to be lawful, and the enforcement of them by the unions through fines or by expulsion held to be lawful. Citing *Bohn Mfg. Co. v. Hollis,* 54 Minn. 223. In the *Bossert* case, the court said:

"An Association of individuals may determine that its members shall not work for specified employers of labor. The question ever is as to its purpose in reaching such determination. If the determination is reached in good faith for the purpose of bettering the condition of its members and not through malice or otherwise to injure an employer the fact that such action may result in incidental injury to the employer does not constitute a justification for issuing an injunction against enforcing such action.

"Workingmen cannot be compelled to work when by so doing their position as workingmen will be injured, simply because if they do not continue their work a manufacturing employer will not be able to sell as large a quantity of material as he otherwise would and thus his good will, trade or business may be affected."

The court further said, considering the rule that union carpenters must not work upon any mill products which were not union made, "When it is determined that a labor organization can control the body of its members for the purpose of securing to them higher wages, shorter hours of labor and better relations with their employers, and as a part of such control may refuse to allow its members to work under conditions unfavorable to it, or with workingmen not in accord with the sentiments of the labor union, the right to refuse to allow them to install non-union made material follows as a matter of course, subject to there being no malice, fraud, violence, coercion, intimidation or defamation in carrying out their resolutions and orders.

"Voluntary orders by a labor organization for the benefit of its members and the enforcement thereof within the organization is not coercion. The members of the organization as we have already stated who are not willing to obey the orders of the organization are at liberty to withdraw therefrom."

A number of rules which prohibit union carpenters from doing certain things in connection with their work are criticised; but the answer is, the employer, when he acts, does so voluntarily. He is never coerced. If the union carpenters among themselves agree to them (and they are not unlawful), as between them and their association, they are binding, and if a contractor sees fit to employ them, he does so with his eyes open and of his own volition. Counsel for the defendant cite *Hopkins v. Oxley Stave Co.*, 83 Fed. 912, and *Barr v. Essex Trades Council*, 53 N. J. Eq. 101, but both those cases were decided, not on an adjudication of rules, but on the ground that, in each case, an illegal boycott had been inaugurated.

It is contended that the Carpenters' Union had no right to solicit and make agreements with employers for a "closed shop," and several cases decided in

other States are cited in support of that claim. Such is not the law in Illinois. *Kemp v. Division No. 241, Amalgamated Ass'n of St. & Elec. Ry. Employees of America,* 255 Ill. 213. In *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184, Mr. Chief Justice Taft said, "The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because, in the competition between employers, they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership, and especially among those whose labor at lower wages will injure their whole guild."

*Auburn Draying Co. v. Wardell,* 227 N. Y. 1. *Coppage v. Kansas,* 236 U. S. 1. The court in the latter case said, "Can it be doubted that a labor organization—a voluntary association of working men—has the inherent and constitutional right to deny membership to any man who will not agree that during such membership he will not accept or retain employment in company with nonunion men? Or that a union man has the constitutional right to decline proffered employment unless the employer will agree not to employ any nonunion man? * * * Every citizen is protected in his right to work where and for whom he will. He may select not only his employer, but also his associates. He is at liberty to refuse to continue to serve one who has in his employ a person, or an association of persons, objectionable to him."

*Gasaway v. Borderland Coal Corp.,* 278 Fed. 56. In the latter case, the court said, "Unions of owners of capital may bargain collectively, through their offi-

cers, with laborers either individually or collectively. Unions of laborers may bargain collectively, through their officers, with employers either individually or collectively. Employers may bargain for a closed non-union shop. Laborers may bargain for a closed union shop. Both are entitled to free and equal access to the pool of unemployed labor, for the purpose of securing recruits by peaceable appeals to reason. Employers may persuade a union man, provided they do not violate his right of privacy nor invade the rights of another, to become nonunion. Union laborers may under the same conditions persuade a nonunion man to become union. If the arguments of the owners of closed nonunion shops should be universally accepted, labor unions would have no ground of complaint, either legal or equitable, for their decline and fall. If the arguments of the advocates of the closed union shop should prevail, then similarly their opponents would have no legal or equitable cause of action. In either case the outcome would be due to the exercise of reason and free will.''

Citing *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229, 62 L. Ed. 260, 38 Sup. Ct. 65, L. R. A. 1918 C 497, Ann. Cas. 1918 B 461; *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184, 66 L. Ed. 189, 42 Sup. Ct. 72; Respective Rights of Capital and Labor in Strikes, 5 Illinois Law Review, 453.

This suit, as a matter of procedure, has a dual aspect. It is brought in equity not because each carpenter has not an adequate remedy at law. He has. But to avoid a multiplicity of lawsuits; that is, as a matter of convenience to the parties and to the administration of justice, one suit for all is brought in equity, and in determining their substantive rights, equity will follow the law. And, on the other hand, as to the application for an injunction, the matters to be determined being equitable, they will be determined according to the principles of a court of equity.

Carpenters' Union v. Citizens' Committee, 244 Ill. App. 540.

It is my opinion that practically all of the activities of the Citizens' Committee have been *ultra vires*; that all throughout its history it and its members have injuriously infringed and impaired the constitutional and common-law rights of the union carpenters; that, notwithstanding certain misconduct on the part of the union carpenters towards certain contractors and nonunion carpenters, a court of equity under the law, with the evidence as it is, was in duty bound to grant relief by way of injunction, and to permit evidence to be introduced on behalf of the complainants on the subject of damages.